Poirier vs. Carroll.

## No. 8612.

### MARIA A. POIRIER, WIDOW AND TUTRIX VS. D. R. CARROLL.

A master is responsible to his employee for damages caused to him by an incompetent fellow-servant.

Notice to the employer of such incompetence, and promise on his part to remove the incompetent fellow-servant, are not indispensable on the part of the injured employee, whose services are hired for a limited time, and who has a right to perform his contract and require his pay.

Laborers, who hire themselves out to serve on plantations, have not the right of leaving the person who has hired them, nor can they be sent away by the proprietor, until the term of their engagement has expired, unless for good and just cause.

The responsibility attaches, undoubtedly, where there is shown a formal notice and an express promise to change, and when a failure to remove and consequent injury resulting therefrom are established. The promise need not be explicit.

Where the verdict of a jury allows disproportionate damages, the allowance will be reduced by the appellate court.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe*, J.

---

*H. N. Ogden* and *A. B. Philips* for Plaintiff and Appellee:

Every act, whatever, of man that causes damage to another obliges him, by whose fault it happened, to repair it; the right of this action shall survive, in case of death, in favor of the minor children and widow of the deceased, or either of them, and in default of these in favor of the surviving father and mother, or either of them. R. C. C., Article 2315. "Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill." Article 2316, R. C. C.

Where the object of the contract is anything but the payment of money, and "in cases of offenses, *quasi* offenses and *quasi* contracts, much discretion must be left to the Judge or jury." R. C. C., Art. 1934, Sec. 3d.

"The damages in such cases, not being susceptible of exact computation, are nevertheless assessed according to the sound discretion of the Judge or jury, and if there are circumstances of aggravation in cases of offenses, or of gross negligence in cases of *quasi* offenses, it is quite proper in assessing damages to adopt the rule laid down in Sedgwick, of blend-ing together the interests of society and of the aggrieved individual, and allowing such damages as would serve to prevent the repetition of such conduct. This wholesome rule is one of the most important safeguards of society, and it would be dangerous to abandon it." See concurring opinion in Black vs. Carrollton Railroad Company, 10 An. p. 40.

The rule or maxim, *respondeat superior*, which forms part of the Roman Law, makes the master responsible for the negligence of his servants.

The limitation of "common employment," as it is called, is undergoing severe criticism, both upon grounds of justice and policy, and the question of its abolishment is presented in leading journals. See article in January and February numbers of Central Law Journal.

But the limitation, as recognized in England and America, had always been subject to many exceptions.

Knowledge, upon the part of the common master, of the incompetence of the servant, by whose fault the injury has taken place, destroys the defense of common employment. The master's primary duty being to secure the servants from all risk arising either from imperfect or inadequate machinery, or unskilful or incompetent fellow-servants of any grade. See case of Laning vs. the New York Central Railroad Company, p. 939, 2 vol. of Thompson on Negligence.

Poirier vs. Carroll.

The question as to whether the injured servant has, by remaining in the service, after discovery of the want of skill or incompetence of his fellow-servant, waived his objection upon that score and released the master from responsibility, is always a question to be determined by the jury, after consideration of the fact of remaining with knowledge, and all the other facts and circumstances proved in the case. See same authority and also "Shearman & Redfield's Commentaries on Negligence," p. 112.

" The doctrine, itself, is but a branch of the general law of waiver and the real question to be determined in each case is whether, under all the circumstances, the master had a right to believe and did believe that the servant intended to waive his objections to the unfitness of his fellow-servant."

Knowledge upon the part of the servant injured is not of itself, in point of law, an answer to the action. See Laning vs. The New York Central Railroad Company, p. 942 of Thompson on Negligence.

A servant, by continuing in the service, after knowledge of defects in the machinery he is obliged to use, does not assume the risks dependent upon the use of such machinery, unless he so continues without objection or protest or without being induced by his master to believe that a change will be made. Thompson on Negligence, p. 1009, and authorities there quoted. The question is always one for the jury.

There is no case, said Mr. Justice Willes, deciding, that where the employer and servant are both aware that the machinery is in an unsafe state, and the servant goes on using it under a reasonable belief that it will be set right by the employer, and it is not set right, and he suffers an injury, he cannot sustain an action. Ibid, p. 1010, vol. 2d.

If the machinery or appliances, though dangerous, are not of such a character that they may not be reasonably used by the exercise of skill and diligence, the servant does not assume the risk. The question of contributory negligence is always one of fact to the jury. Ibid, p. 1011.

"The principle laid down in Priestly vs. Fowler, and all the examples there given of their application, relate to the conveniencies and casualities of ordinary or domestic life, and ought not to be strained so as to regulate the rights and liabilities arising from the use of dangerous machinery." See opinion of Byles, J. in Holmes vs. Clarke. Thompson on Negligence, 2d vol. p. 967.

The jurisprudence of Louisiana has never gone to the result sought to be maintained by defendant in this case. In the case of Clement Camp vs. The Church Wardens of the Church of St. Louis and J. P. Kirwin, the learned Chief Justice Eustis, denied both the justice and policy of the rule laid down in Priestly vs. Fowler, adhering to a decision of the Court of Cassation, which refused recognition to the limitation of common employment. See 7 An. p. 321.

The limitation has certainly never been sufficiently ingrafted in our system to warrant this Court in going to the extreme claimed for it in the case at bar.

There are but two decisions of this Court in which the doctrine of common employment is considered. Cases of "Hubgh vs. Carrollton R. R. Co.," reported at p. 496 of 6th An., and "Camp vs. The Church Wardens of Church of St. Louis and J. P. Kirwin," 7 An. p. 321.

In the first of these decisions the principal discussion was upon "the right to an action for damages caused by the homicide of a free human being." This question evidently received the special attention of the Court, and its decision, adversely to the right of action, really decided that case. The decision of other questions cannot be said to have been necessary after the right of action had been denied. What is said by the Court in reference to these questions may therefore be regarded as in some sense obiter. In refusing the rehearing in the Hubgh case, it will be observed that Chief Justice Eustis confines himself almost entirely to the question of the right of action. The important question of the liability of the master to a servant for injury received from the negligence or incompetence of a fellow-servant cannot be said to

Poirier vs. Carroll.

·have received that careful consideration which it did in the subsequent case of Camp vs. The Wardens of the Church of St. Louis and J. P. Kirwin.

In the Camp case the decision in the Hubgh case was before the very court, the identical Judges, who decided it—it was indeed still under advisement. The court upon this doctrine of common employment was divided. The Chief Justice opposing its application while he admits that the Hubgh case recognized it. He declares that the Court of Cassation "recognizes no such exception from the general rule, of the responsibility for acts of servants in the business of their employment." This case of Camp vs. The Wardens, having divided the Supreme Court, rested finally on the decision of the lower court, which was against the doctrine of common employment. The question cannot, therefore, with any propriety, be said to have been settled in Louisiana by decisions, as it was elsewhere, and we do not require legislation, as in England and in some States of the Union, to get rid of it. Its impolicy and injustice are becoming evident among all the people where it has prevailed and they are endeavoring to undo the mischief by legislative action. See "Employers' Liability Act," passed by English Parliament and entitled "An act to extend and regulate the liability of employers to make compensation for personal injuries suffered by workmen in their service." This Act went into operation January 1st, 1881, and so far as railroads are concerned has abolished the distinction.

The question to this Court is whether or not it will adopt a rule, which, after fifty years trial, England is abolishing as unjust. Every day's experience makes it more manifest, that the doctrine ought not to be allowed. No more striking illustration of its impropriety could be presented than the case at bar. Some dozen persons, all employees, were either killed or maimed by a species of carelessness, the most revolting imaginable. Lord Abinger and Chief Justice Shaw did not well forecast the future and see to what an extent dangerous machinery would come into employment, or they could never have sanctioned a principle so full of peril to honest and faithful employees.

Byles, J., in the case of Holmes vs. Clark, given above, restricts the doctrine "to the conveniences and casualties of ordinary life." He will not allow it as to dangerous machinery. He saw the peril that must follow to honest workmen from an unrestricted application of a rule by which immunity is not only given, but a premium actually set upon the carelessness of selfish employers.

## *E. D. White* and *E. D. Saunders* for Defendant and Appellant:

1. Where a servant is injured by the negligence of a fellow-servant, the general principle is that the injured servant cannot hold the master liable in damages. Thompson on Negligence, Vol. II, pp. 917, 969; Cooley on Torts, p. 542; Hubgh vs. Railway Co., 6 La. An. 495.

2. This rule governs in all cases, unless it be shown that the master negligently employed, or negligently retained an incompetent servant. Cooley on Torts, p. 558; Thompson on Negligence, Vol. II, p. 974.

3. But the above exception does not protect the servant who either entered upon or remained in the employment, with full knowledge of the incompetency of the fellow-servant, and of the danger resulting therefrom.

The servant is, in such case, presumed to have assumed the risk from such incompetency, whether the master did or did not know thereof, unless it be shown that the master promised to discharge the incompetent servant. Thompson on Negligence, Vol. II, p. 1009, and cases there cited. Hough vs. Railway Co., 100 U. S. 214; Dillon vs. Railway Co., 3 Dill. 328; Laning vs. Railway Co., 49 N. Y. 534; Hayden vs. Manf. Co., 29 Conn. 558–9.

4. The burden of proof is on the servant in a suit of this sort, to establish affirmatively:

    *a.* The incompetence of the fellow-servant.

    *b.* The master's negligence in employing or retaining him.

    *c.* The making by the master of the alleged promise to discharge. Woods on Master and Servant, §419, p. 802; §408, p. 783; Cooley on Torts, p. 564; Shearm. & Redf. on Negl.

§99, p. 128; Pierce on the Law of Railroads, p. 382; Underhill on Torts, p. 329 ; Hicks vs. Martin, 9 M. (La.) 48; Ransom vs. Labranche, 16 La. An. 121; Kirk vs. Folsom, 23 La. An. 584; Thompson on Negl., Vol. II, p. 1053, §48.

The opinion of the Court was delivered by

BERMUDEZ, C. J. This is an action in damages by a widow and tutrix. The damages claimed are said to have been occasioned a husband and father by the incompetence and negligence of a fellow-servant in defendant's employ, and to have consisted in the endurance of excruciating pains which lasted some twenty-four hours, ending with loss of life.

The answer contains a general denial and, in exoneration of liability, a charge of contributory negligence.

From the judgment based on the verdict of the jury, the defendant has appealed.

The action is brought under the provisions of Articles 2315, *et seq.* of the R. C. C., which are to the effect, that every act whatever of man which causes damage to another, obliges him by whose fault it happened to repair it; the right of such action surviving, in case of death, in favor of the minor children and widow of the deceased, or either of them, and the responsibility being fixed on the person occasioning the damage, not only for his own deed, but also for that of persons for whom he is answerable, and for the injury caused by things in his custody. It is specially founded on Article 2320, which declares, that masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed, the responsibility attaching when the master might have prevented the act which caused the damage and has not done it.

We do not propose to take up and analyze the conflicting testimony of the twenty odd witnesses heard in this case, to ascertain and declare what facts were proved. We will remain satisfied with announcing our conclusions, which are the result of attentive examination and study.

Alfred Poirier was a skilled engineer. In November, 1879, he was employed by the defendant to take off his sugar crop from his plantation, and was given one Rolf as his assistant.

In the course of time, apprehending that Rolf was incompetent and negligent, Poirier made it his duty to apprise J. R. Carroll, the plantation manager, of his deficiencies and shortcomings, accompanying the information with a request for a change of that assistant. The answer to this was, that *if* another assistant could be got as cheap, the change would be made. The testimony of Chaperon, a disinterested witness,

is entitled to more weight on this subject than that of J. R. Carroll, with which it conflicts, for the reason that the latter had an interest in screening himself from responsibility towards the owner of the plantation, in case of dereliction of duty on his part and consequent injury inflicted on his principal.

On the 20th of January, 1880, between two and three o'clock in the morning, Poirier, then off duty, was asleep in a bunk which he usually occupied over the boilers. His assistant Rolf was at the time in charge of the engine.

All of a sudden an explosion took place, by which Poirier was so severely injured, that he died from the effects of it after suffering pains, the intensity of which, though somewhat established, may be better imagined than expressed.

It is proved that the explosion is attributable, not to any defect in the machinery, but to the fact that cold water was used and pumped by Rolf into a boiler, when the water in it had sunk below the last guage cock, and that the accident could have been prevented by his pulling the fire out.

Under such a state of facts, the defendant substantially charges that, as Poirier had full knowledge of the incompetency of Rolf, his fellow-servant, and of the possibility of danger and accident resulting therefrom, and yet remained in his master's employ, he is presumed to have assumed voluntarily the risks attending and waived all right to personal security and to indemnity for injury to his person.

It is further urged that, in any contingency, he was guilty of contributory negligence, and from no standpoint can he recover.

It is finally insisted that the District Judge erred in refusing to give to the jury charges asked, and that the verdict was erroneous.

Hence, we consider that the question presented by both litigants can be well stated mainly to be:

Whether, where a servant, who is aware of the incompetency of his fellow-servant, notifies his master of the same, but continues in his service, and sustains injury in consequence of the deficiency or negligence of such fellow-servant, whether notice was or not given to, or a promise made or not by the master—recovery can be had from him for damages suffered by the servant.

The general principles governing a case like that presented are unambiguous. The common and civil law are alike on the subject.

It is conceded by the defendant to the extent that, where a servant is injured by the incompetence and negligence of a fellow-servant, the injured servant cannot hold the master liable in damages, *unless* it be shown that the master negligently employed or retained an incom-

petent or careless servant. The concession is not a liberal one. See Thompson on Negligence, Vol. II, p. 917, 969, 974; Wharton on Neg. § 324; Cooley on Torts, pp. 542, 558; Pierce on R. R. p. 379.

But it is claimed further, that the servant, in the excepted cases, is not protected, 1st, *unless* it is shown that the master was notified and promised to discharge the incompetent servant; 2d, *unless* the injured servant was not guilty of contributory negligence.

The proposition might be yielded, except so far, however, as it implies, as an essential element for recovery, the pre-existence of a promise or some engagement on the part of the master to discharge the incompetent servant.

No doubt cases have arisen in which proof of an express promise, or of an inducement having been adduced, recovery was allowed, but it must not be inferred from such incidents that a promise *eo nomine*, whether formal or virtual, was declared to be an indispensable condition *sine qua non*. 6 Hul. N. 349; 7 Ib. 937; 3 Dillon, C. C. Rep. 328; 49 N. Y. 534.

In the Hough case, 100 U. S. 225, the Court said:

"There can be no doubt, that when a master has *expressly* promised to repair a defect, the servant can recover for an injury caused thereby, within such a period of time after the promise as it would be reasonable to allow for its performance."

But the Court does not assume to go to the length of saying, that *unless* the promise was *explicit*, recovery could *not* be had. It has left it to be determined whether *any* promise is necessary, and whether an implied promise, if one be indispensable, from which the complaining servant may deduce and entertain a hope, however weak or slim, is not sufficient even in the absence of a contract for the hire of labor for a limited time. In the case of Laning vs. Central R. R. Co., 49 N. Y. 534, in which the limitations and exceptions put to the rule were considered, the Court said, Folger, J.:

"The duty of the master, as it is sometimes put, or his implied contract with his servant, as it is differently intimated, leads to another conclusion. That duty or contract is to the result, that the servant shall be under no risks from imperfect or inadequate machinery, or other material means and appliances, or from unskilful or incompetent fellow-servants of any grade. It is a duty or contract to be affirmatively and positively fulfilled and performed. And there is not a performance of it until there has been placed for the servant's use perfect and adequate physical means, and for his helpmeets fit and competent fellow-servants, or due care used to that end. That some general agent, clothed with the power to make performance for the master, has

not done his duty at all, or has not done it well, neither shows a performance by the master, nor excuses the master's non-performance. When it is done, and not until then, his duty is met or his contract kept. * * * If a master's personal knowledge of defects be necessary to his liability, the more he neglects his business and abandons it to others, the less will he be liable." We therefore hold, continues the Court, that a master is liable to his servant for an injury caused by the incompetency or want of skill of a fellow-servant, whether it existed when the fellow-servant was hired, or has come upon him since the hiring, the fellow-servant having been in the first instance hired or afterward continued in service, with notice or knowledge, or the means of knowledge of this lack. The duty of the master to his servants is to use reasonable care to provide and employ none but competent and skilful servants, and to discharge from his service, on notice thereof, any one who fails to continue such.

. Applying the rule to the case before them, the Court concluded, saying that they are of opinion that the defendant was negligent towards the plaintiff in retaining the fellow-servant in its service, after his habit of drinking to drunkenness was known to the general agent.

In the present case, however little, Rolf's negligence may have to be considered, it is indubitable that he was incompetent and was previously known to be so; that Poirier notified Carroll, and that some sort of a statement or answer was made to him, the purport of which was to give him some hope that a change would be accomplished. The word *if*, testified to by Chaperon, the witness, can be well understood as meaning *when*.

On principle, justice and law, Carroll was bound to give to Poirier a competent assistant. When he was notified by Poirier of Rolf's incompetence, his duty was to have discharged him. He admitted that incompetence by promising a change *when* he would get as cheap an assistant.

. Had he discharged Rolf and replaced him by a competent man, the explosion directly caused by Rolf would not have occurred, and Poirier would not have been the victim of it.

His omission to make the change, after notification and knowledge of the incompetence, was negligence on his part, and on that account was enough to fix a liability on the defendant, his employer, for damage sustained in consequence.

The fact that Poirier continued in the service of the defendant cannot be considered as a waiver or as contributory negligence, barring a recovery of damages.

89

Eminent text writers have said on this subject:

" The mere continuance of a servant in his work has been treated as conclusive evidence of his having waived objections to defects in his associates or his materials. Such rulings are unjust, because a servant has the same right to complete his contract, in reliance upon its original terms, that anyone else has. * * * The real question to be determined in each case is: whether, under all the circumstances, the master had a right to believe and did believe, that the servant intended to waive his objection to the unfitness of his fellow-servant, or the defect in the materials provided for the work." See Shearman and Redfield on Neg., p. 112.

Poirier had a contract with Carroll for the hire of his services, which was for the limited time required to take off the crop, that is, several months at a monthly salary, under which he was bound to serve for the grinding season.

The Code provides, in this respect, that: laborers who hire themselves out to serve on plantations have not the right of leaving the person who has hired them, nor can they be sent away by the proprietor until the term of their engagement has expired, unless good and just causes can be assigned.

Had Poirier thrown up his engagement and left his employment, owing to his fears and apprehensions of danger and injury which might have resulted from his conception of Rolf's incompetence, and had he afterwards brought an action for payment, and been unable to establish with legal certainty the existence of a just and good cause, to the satisfaction of a court, with a burden of proof upon him, the consequence would have been to him the loss of not only his pay for time to come, but also the return to his employer of that already received. R. C. C. 2748, 2750.

Poirier was not bound to undertake that risk. He had a right to remain, notwithstanding his fears of danger. By remaining and doing his duty, he would be entitled to pay and thus meet his responsibilities.

From the fact of his thus continuing, we are averse to infer that he waived his right to a fitness of his fellow-servants, and to a life which he could not in conscience rashly expose, as it was not only useful to himself, but precious to his wife and minor children, who depended on him for support and maintenance.

We do not understand the doctrine of common employment announced in Priestly vs. Fowler, 3 Mer. and W. 1, often criticised, possibly overruled, and in Hubgh vs. R. R. Co., 6 An. 490, as having a direct bearing upon this case.

In the case of Laning, to which we have already referred, and which

was decided by the N. Y. Court of Appeals in 1872, the Court said, speaking of the fellow-servant:

" If he remains without promise of a change, or other like induce-ment, it is for the jury to say whether or not he voluntarily assumed the risks of defective machinery or of incompetent servants, whereof he had full and equal knowledge." 49 N. Y. R., pp. 941-2.

But it is claimed that, be all this as it may, Poirier contributed to his own death by sleeping over the boilers.

It is established that the spot was designated as the corner which had been fixed for the engineer by the master; that it was customary for him to sleep there. Sleeping over the boilers of an engine is not in itself an acknowledged act of imprudence. It shows no want of ordinary care, and has not a proximate connection with the injury complained of. There to sleep is comfortable in the winter, and is a fact of fre-quent occurrence with persons who travel by water, whether navigat-ing rivers or seas. We attach little importance, if any, to the conflict-ing statements máde by witnesses, whom the jury did not believe, that Carroll notified Poirier not to sleep there.

No doubt, precisely because of his suspicions of Rolf's want of skill or negligence, and of his uneasiness on the subject, Poirier, as an over-cautious and conscientious servant, had made it his duty to remain close by, in order, at the least notice or noise, to be on hand and ready to protect both life and property.

To blame him and to visit want and misery on his helpless widow and orphans, on account of his devotion for his master's interest, is a defense which comes with exceptional ill grace from his thankless employer, and to which we think it our duty to turn a deaf ear.

The District Judge was asked to instruct the jury, that if the servant remained after discovering the danger, and without promise of removal by the master, he did so at his peril and has no claim for damages, if afterwards injured by the known danger.

The Court charged the jury, that if they found that Poirier had been employed under a *contract* for a specified time, and was discharging his duties under such contract, then and in that case, it was immaterial whether the defendant, upon being informed of the incompetency of the assistant engineer, promised to discharge him or refused to do so.

The charge asked required explanation and qualification. The Judge was not bound to give it as put. That which he gave accords with our views, and is justified by law.

We have read with interest the ably guarded written charge given by our learned brother to the jury, and which contains instructions on nine different points, covering nearly six pages of the transcript, and

remain satisfied that it was well calculated to enlighten the jury, and that it informed them correctly of all material points of fact and law to which their attention should have been directed. We notice no bill to such written charge.

The verdict of the jury was for $12,000. We think it is excessive, and should be reduced. The suit is not, nor could it be brought for damages sustained in consequence of the death of Poirier, but for the suffering and pains which he endured from the time of the explosion to that of his death, a period of some eighteen hours, during part of which he was apparently insensible or unconscious. Whatever the endurance was, his widow and minors cannot recover heavier damages than he would have been entitled to demand and receive had he survived, fully recovering at the very moment when he actually died.

· In the case of Vredenburg, in which the unfortunate victim had been sprung upon by a ferocious bear which lacerated his flesh, and suffered torture ending after twenty-eight days, the jury had allowed $15,000, but their verdict was reduced to half.

We do not think that, under the circumstances of this case, from which it appears that the suffering endured by the deceased did not last twenty-four hours, the plaintiff should be permitted to recover more than twenty-five hundred dollars.

It is, therefore, ordered and decreed that the verdict and judgment thereon and appealed from be amended, by striking therefrom the words "twelve thousand dollars," and inserting in place thereof the words "twenty-five hundred dollars," ($2,500) and that thus amended the same be affirmed; the costs of appeal to be paid by plaintiff, and those of the lower court by the defendant.