Rice vs. Crescent City Railroad Co.

## No. 12,816.

PHIL. R. RICE AND LUCILLE RICE, HIS WIFE, vs. THE CRESCENT CITY RAILROAD CO.

### SYLLABUS.

1. A plaintiff's act or omission when only a remote cause, or a mere antecedent occasion or condition of the injury inflicted, is considered not to be contributory negligence.

2. A child of three and a half years is, of itself, incapable of contributory negligence.

3. No man should be in charge of an electric car as motorneer, running along populous thoroughfares of a city, who has not the full and complete use and sight of both eyes.

4. No doctrine or rule exists here that the negligence or imprudence of a plaintiff, while not of the proximate character to defeat his recovery, may yet be looked to by the jury or court in mitigation of damages.

5. Nevertheless, this court has constantly exercised its reasonable discretion of increasing or diminishing the sums awarded for damages, according as its judgment, operating on the facts, prompted in given cases.

6. It has never been the intention to fix by rule specific sums for different classes of injuries, nor for varying grades and duration of anguish and suffering.

7. In this respect, each case is considered independently on its merits and on the state of facts peculiar to it, a due regard, however, being always had to the proper observance of a reasonable uniformity of jurisprudence on general lines.

ON APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Buck, Walshe & Buck* for Plaintiffs and Appellees.

*Farrar, Jonas, Kruttschnitt & Gurley* for Defendant and Appellant.

Argued and submitted November 10, 1898.
Opinion handed down January 9, 1899.

The opinion of the court was delivered by

BLANCHARD, J. Plaintiffs sue for twenty-five thousand dollars actual damages for the killing of their three and a half year old child,. a little girl, by the electrically-propelled street railway car of defendant company.

The action is brought under the provisions of Article 2315 of the Revised Civil Code of Louisiana.

The demand is for the damages only which the child might have recovered if it had survived, and, consequently, the claim as presented is one accruing to the parents as heirs of their deceased offspring.

The defense interposed is that the child was injured entirely through the fault and carelessness of the nurse in whose charge she was; that the nurse was the servant of the plaintiffs, who must be held responsible for her acts; and that if the conduct of the nurse was not the sole cause of the accident, it was the contributing cause.

The case was tried by jury, who returned a verdict of twelve thousand five hundred dollars for plaintiffs, and from a judgment based thereon, defendant company appeals.

A preponderance of evidence sustains, we think, the following. statement of the case:

Rebecca Cobb, a colored woman, fifty-one years of age, was employed as nurse to the children of plaintiffs. There were two children —the little girl, whose death was the occasion of this suit, and a baby boy less than a year old. The colored woman was, strictly speaking, the nurse of the baby, but it was usual for her to take the two children out for a walk or airing in Audubon Park in the upper part of the city of New Orleans. Plaintiffs lived opposite the upper end of this park.

November 18, 1896, was a bright, clear, warm autumn day.

In the forenoon of this day the nurse started out with the two children. Her destination was the Park. She had them both in a baby carriage. She appears to have taken the direction down St. Charles avenue to Calhoun street, paid a visit to some one's house, and then proceeded along the lower side of the latter street towards Magazine street. Magazine street runs parallel to St. Charles avenue and distant from it some half dozen blocks. Audubon Park extends from the river to St. Charles avenue. Calhoun street is the first street below the Park and distant from the Park about one block. It crosses. Magazine street not far from the river. Calhoun street, including banquettes, is forty-two feet wide, and Magazine street, at the inter--

section of the two, is thirty-five feet wide. Along the center of Maga-
zine street ran two tracks of defendant company's street railway. The
upper track—the one nearest the river—was used by the cars going
down town, and the lower track by those going up town. The space
in the street between the outer rail of the lower track and the gutter
curb is nine feet, and that between the outer rail of the upper track
and the curb ten and a half feet. Magazine street, at that point, is
unpaved, and appears not to have been used to any great extent by
vehicles drawn by horses, for the street, on either side of the railway
tracks, was covered with grass from six to eight inches high.

Pushing along the baby carriage with its two occupants, the nurse
reached Magazine street, when the little girl expressed a wish to get
out "to pick some flowers." These flowers are supposed to have been
some clover blossoms growing among the grass in the street near the
curb. The nurse assented, put the little one out of the carriage, and
then proceeded across Magazine street with the carriage containing
the baby. Reaching the river side of the street she turned up, or
towards the Park, crossed Calhoun street and then proceeded up the
banquette on Magazine street. Meanwhile the little girl had crossed
Calhoun street and proceeded along the lower side of Magazine street
in the space between the banquette and the railway track.

Magazine, at the intersection of Calhoun street, is perfectly level,
and is straight, looking down town, for a distance of nine hundred
feet. Along this straight, level track, at this moment, came car No.
162 of defendant company, going up town. It stopped at Henry Clay
avenue, the first street below and parallel to, Calhoun street, and dis-
tant from the latter 304 feet.

When the car started on its upward journey, after its momentary
stop at Clay avenue, there were five persons aboard. They were Hat-
horne, the conductor, Fenwick, the motorneer, Diest, a motor in-
spector and repairer of cars of defendant company, who had boarded
the car some blocks below and was on his way to his home up town
for his mid-day meal, and two passengers, Vance and Perilloux.

In releasing the brake of the car to start from Henry Clay avenue,
the crank or handle of the brake slipped from the hand of Fenwick,
the motorneer, and, rapidly revolving, struck him in the stomach.
Diest, the car repairer, was on the front platform with Fenwick. The
blow from the crank of the brake sickened the latter, and he requested
Diest to take charge of the car. The latter consented, stepped into

Fenwick's place, and Fenwick, opening the door, entered the car to sit down. The two passengers were sitting in the interior of the car and the conductor was on the rear platform.

Diest was not a motorneer, but had learned something of the business of running cars on the route, and had had a good deal of experience in running them up and down the car barn, testing the apparatus after making repairs.

He was not a skilled or experienced motorneer in handling cars on the regular runs. Indeed, beyond a half day's work running cars on regular runs he had had no experience in that line of service.

His right eye had been injured in an accident, and it is a fact that he was almost blind in that eye.

As the child, who was run over, was to the right of the car as it went up town, it will be noticed she was on the blind side of this temporary motorman.

One hundred feet from Henry Clay avenue, going towards Calhoun street, is a circuit breaker, i. e. where the continuity of the trolley wire is broken, and at which point it is usual to turn off the current until the trolley wheel has passed this break of continuity.

Diest took charge of the car just before it reached the circuit breaker.

He was then something over 193 feet from Calhoun street, that street is 42 feet wide, and according to his testimony, the child was about ten feet above the Calhoun street crossing. It thus appears that she was, in the view most favorable to defendant, at least two hundred and forty-five feet up Magazine street at the moment Diest assumed control of the car. The street was, as stated, level and straight and nothing obstructed the view of the child. As Diest was on the front platform when the car left Henry Clay Avenue, there was nothing to prevent his seeing her as far back as that point.

As the car passed the circuit breaker in his charge he increased its speed and went rapidly forward.

Diest did not see the child until his car had reached the crossing of Calhoun street. Indeed, in his examination in chief, he says his car was midway of the two crossings of Calhoun street at the time he saw the child. If he saw her for the first time when his car reached the lower crossing of Calhoun street, he was then distant from her only fifty-two feet; if he first saw her when his car was midway of the two crossings he was only thirty-one feet from her. Either distance

was entirely inadequate to the timely stoppage of the car. He should have seen her from the time he left Henry Clay avenue, and was guilty of gross negligence in not seeing her when he assumed control of the car at the circuit breaker.

Having crossed Calhoun street on the river side of Magazine street and proceeded up the banquette of the latter street, the nurse with the infant in the baby carriage had reached a point about thirty feet above the upper crossing of Calhoun street when she realized that the little girl across the street might be in danger from the rapidly approaching car. Thereupon she left the baby carriage and baby on the banquette and calling to the other child to stay where she was, and hailing the car by voice and signal to stop, she rushed across the street to the child. At that moment the child was in that space of the street between the curb and the outer rail of the up town track. She was perhaps nearer the curb than the rail, but was making towards the track, unconscious, in her infancy, of the danger she was approaching and heedless of the cry of the nurse to stop. The woman succeeded in clearing the two tracks and seizing the child, but too late. At the moment she reached her the latter was at the outer rail of the track, and immediately the car was upon them. When the car struck, the woman fell upon the fender, was carried along a little distance, and then thrown to the right into the street. The little girl was thrown under the car and dragged 150 feet up the track before the car could be stopped.

She was found to be under the rear truck of the car, was taken out horribly mangled and died in about an hour after the accident.

Diest and Fenwick, as witnesses for the defense, assert that the woman, after reaching the child on the street, started back with her across the track, and in consequence of this was run over. If this was established it would relieve the company of liability. But we do not consider it established.

The great preponderance of the testimony is that the woman, the child and the car all came together at the same moment, and that just as the woman laid hands on the child in her effort to save it, the impact came.

While it is not altogether certain that the acting motorman sounded his gong, conceding that he did so, it was done too late.

The attempt to stop the car was not timely, or else the acting motorman bungled in his efforts to do so. The fact that the car ran 150'

feet after the woman and child were struck is eloquent in refutation of the contention of the defense that there was neither negligence in the effort to stop the car, nor want of skill on part of the motorneer in doing so.

The attempt to show that the track was "sweaty" and otherwise in such condition that the car slipped and slided and rendered futile the effort to more speedily check it, in our opinion, failed. The accident happened a little after noon on a bright, sunshiny day.

In the nature of things the track was dry and there was testimony to that effect.

That the nurse was not wholly mindful of her duty when she put this child of tender years down on the street with permission to walk along it gathering flowers, in close proximity to the tracks of an electric street railway, is beyond peradventure. But this conduct of hers cannot be held to have contributed proximately to the tragedy.

It has even been held that where the conduct of a claimant has, as a matter of fact, contributed to the accident, but such conduct was not in a legal sense imprudent or negligent, recovery may be had of a defendant in fault. Knight vs. Pontchartrain Ry. Co. 23 La. Ann. 464. See also Reynolds vs. Railroad Co., 37 La. Ann. 693; Thompson on Negligence, Vol. 2, p. 1129.

A plaintiff's act or omission, when only a remote cause, or a mere antecedent occasion or condition of the injury inflicted, is considered not to be contributory negligence. A. & E. Ency of Law, Vol. 7, Second edition, p. 373.

A child of three and a half years of age is, of itself, incapable of contributory negligence. 47th La. Ann. 1218; 43 La. Ann. 63.

Defendant company is, of course, answerable for the fault, imprudence, negligence, want of skill or of circumspection, of its employees while in the performance of their duties.

It is impossible to escape the conclusion that there was in this case both negligence, and want of skill and circumspection.

When the accident occurred, and for 250 feet before the child was reached, the car was in charge of a man acting as motorneer, who, from his want of practical experience in running, handling and managing electric cars on the regular runs, must be held to have been incompetent. To this must be added the further circumstance that he was almost entirely blind of one eye, and that eye, unfortunately, on the side next to the child.

No man should be in charge of an electric car as motoneer, running along populous thoroughfares of a city, who has not the full and complete use and sight of both eyes.

The child should have been seen when the car resumed its up-town journey from Henry Clay Avenue. All the more she should have been seen by Diest when, at the circuit breaker, he relieved Fenwick of control of the car.

If he saw her and failed to govern his car accordingly—running at such slow speed as to be able to check it immediately should the imminence of danger appear—he was guilty of the grossest, if not criminal, neglect. If he did not see her, it was due to the fact that he was not performing his duty by keeping a sharp out-look, or to the fact of his blindness. In either event, the company is liable.

Nelson vs. Ry. Co. 49 La. Ann. 497; Barnes vs. Ry. Co. 47 La. Ann. 1218; Thorp, Westerfield et als. vs. Levis Bros., 43 La. Ann. 63; Maguire vs. Ry. Co. 46 La. Ann., 1543; Gallagher vs. Ry. Co. 37 La. Ann. 288; Curley vs. Ry. Co. 40 La. Ann. 811.

This brings us to the consideration of the amount for which plaintiffs should have judgment as damages. The verdict returned by the jury, fixing the amount at $12,500.00, is excessive, in view of the established jurisprudence of the State.

As hereinbefore stated, plaintiffs are not suing for any damages they, themselves, suffered by reason of the dreadful calamity which befell them in the loss of their child. No amount of pecuniary compensation could palliate that loss, nor assuage the heartbroken grief of which it must have been the occasion. They sue only for such damages as the child, itself, could recover on account of its injuries and sufferings, had it survived the shock.

We have, in this State, no doctrine or rule that the negligence or imprudence of a plaintiff, while not of the proximate character to defeat his recovery, may yet be looked to by the jury or court in mitigation of damages.

Nevertheless, this court has constantly exercised its discretion, within reasonable limits, of increasing or diminishing the sums awarded for damages by the verdicts of juries, or the decrees of inferior tribunals, according as its judgment, operating on the facts, prompted in given cases.

It has never been the intention to fix by rule specific sums for different classes of injuries, nor for varying grades and duration of an-

guish and suffering. In this respect, each case is considered independently on its merits and on the state of facts peculiar to it, a due regard, however, being always had to the proper observance of a reasonable uniformity of jurisprudence on general lines.

The facts and circumstances of this case, we think, justify the reduction of the verdict of the jury from twelve thousand five hundred dollars to four thousand dollars, and this reduction and its extent is sustained by the following authorities: Vredenburg vs. Behan, 33 La. Ann. 644; Poirier vs. Carroll 35 La. Ann. 699; Towns vs. Ry. Co. 37 La. Ann. 630; Van Amberg vs. Ry. Co. 37 La. Ann. 655; Westerfield vs. Levis 43rd La. Ann. 63; Mattise vs. Ice Co. 46 La. Ann. 1535; McGuire vs. Ry. Co. 46 La. Ann. 1543; Bland vs. Ry. Co. 48 La. Ann. 1057.

But we do not, considering the same facts and circumstances, feel authorized to reduce it below that sum, as strenuously insisted on by defendant's counsel, even though the court, in the authorities last cited, may have, in most if not all of them, fixed upon smaller allowances in analogous cases.

For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be amended by reducing the same to four thousand dollars, and that, as thus amended, it be affirmed, costs of appeal to be taxed against plaintiff and appellee.