No. 13,801.

GEORGE W. LAMPKIN VS. J. H. McCORMICK, RECEIVER OF VICKSBURG, SHREVEPORT AND PACIFIC RAILROAD COMPANY.

## SYLLABUS.

1. Railroad corporations backing their trains through danger points in the streets of a city must use proper care and take proper precautions to safeguard citizens upon them. If they entirely fail to do this, they assume the risk of injury to individuals even if the injury received be due to some extent to the latter's imprudence and forgetfulness. They can not fail entirely in their duty and argue that had the duty been performed it would have been in the particular case unavailing. The results should have been put to the test by actual trial made at the time.

2. A street of a city does not cease to be such because left unimproved and almost its entire width, with the consent of the Council, is occupied by the tracks of railroad corporations. The open spaces between the railroad tracks are public places and persons occupying them are neither trespassers nor licensees.

3. Where trainmen in control of a railroad train, back it down opposite a danger point in the street of a city, without precautions of any kind to signify its approach or to warn or protect citizens, at the precise moment that a passenger train is moving in the other direction on a parallel track, and in so doing strikes and kills a person occupying the open space between the two lines of track, the company is responsible for the injury, although the person injured may have contributed to some extent, by imprudently backing in a moment of forgetfulness into the open space taken up by the overlapping of cars, outside the rails.

APPEAL from the First Judicial District, Parish of Caddo—*Land*, J.

*Sutherlin & Hall*, for Plaintiff, Appellant.

*Wise & Herndon*, for Defendant, Appellee.

The opinion of the court was delivered by NICHOLLS, C. J.

## STATEMENT OF THE CASE.

NICHOLLS, C. J.   In the petition filed by the plaintiffs they averred that J. H. McCormick in his capacity as receiver of the Vicksburg, Shreveport and Pacific Railroad Company, was indebted to them in the

sum of ten thousand and thirty-eight dollars and ten cents, for which they prayed judgment.

They alleged that said corporation with all its property was placed by judicial decree of the Circuit Court of the United States for the Fifth Circuit and the Western District of Louisiana, at the said city of Shreveport, rendered on the 21st day of April, A. D. 1900, in the hands of said J. H. McCormick as receiver, with the authority and directions to him to take possession of all the property of said corporation and operate and cause to be operated the said line of railroad as it had theretofore been operated by the said corporation; and that in the operation of said railroad by said receiver under his said appointment in said receivership, through his servants and employees, their son, Norman A. Lampkin, was struck, knocked down and run over, and thereby injured and killed by a moving train of freight cars of said railroad, in said city of Shreveport, on or about the 26th day of June, A. D. 1900, by reason of the torts, faults, wrongs, carelessness, omissions, and gross negligence of the servants and employees of said receiver in charge of and operating the said train of freight cars; and that said accident happened on Cotton street in said city between Commerce or Levee and Market streets.

They entered into a minute description of the locality where the accident occurred and the circumstances connected with the same.

The defendant answered, pleading the general denial and averring contributory negligence on the part of the plaintiff.

The jury returned a verdict in favor of the defendant and judgment was rendered accordingly.

Plaintiff appealed.

### OPINION.

The evidence shows that the railroad of defendant company enters the city of Shreveport from the east over a bridge spanning the Red river. The west end of the bridge rests upon the edge of Levee or Commerce streets, which runs along the river front, between the city and the river. The bridge is opposite to the mouth of Cotton street and the tracks of defendant's road run from the Red river bridge, across Commerce street and up Cotton street, for several blocks; its freight depot being on the side of Cotton street between Commerce street and Spring street, the next cross street back; the passenger depot being several blocks further up in the city. Spring street crosses Cotton street

on a high overhead bridge, supported by wooden posts and sills resting upon the ground. The bridge has several spans through which there are open spaces and railroad tracks.

The Shreveport and Red River Valley Railroad also approaches the city over the same railroad bridge, over the Red river, and uses the tracks of the defendant company, back as far as Spring street. At that point, the trains are stopped, switched off and backed down to its own depot on Red river, just below the railroad bridge.

There are at Spring street two or three tracks of the defendant company, which run parallel to each other, the main track being in the center, and the side tracks being alongside with intervening spaces. The evidence shows that many persons go to Spring street when the passenger trains of the defendant company and those of the Red River Valley Railroad reach that point, in order to see or meet passengers or to board the trains, and that passengers frequently leave the trains at that point to go into the city. The point in question is not one provided by either company for the receiving or landing of their passengers; there are no platforms placed there nor other arrangements made for the convenience of passengers. The companies are much opposed to their passengers getting on or getting off at that point and have tried, but in vain, to prevent it.

On the morning of June 26, 1900, a young colored man named Norman Lampkin, living with his parents in Shreveport, left his home and went down to the overhead bridge at the corner of Cotton and Spring streets and sat down there. As the passenger train of the Red River Valley road was approaching Spring street, on the main track of the defendant company, he rose from his seat and walked to meet it, when it should make its usual stop. What his object or purpose was in going to the train the record does not disclose. He was not an employe of either company, nor were there any contractual relations between them.

As the Red River Valley train was reaching its switching point at the corner of Spring and Cotton streets, from the Red river railroad bridge, a freight train of the defendant came backing down opposite to it, moving east towards the railroad bridge. The sides of the cars of each company projected on each side about two and a half feet beyond the rails on the tracks. As the freight train passed down it struck and immediately killed Lampkin, who was then in the space between the two tracks which the trains occupied, and so near to the rail of the sidetrack of the defendant company as to be reached by a projecting corner of

one of the cars on that track. The freight train consisted of about sixteen or eighteen cars. Its engine was at the end of the train farthest from the direction in which the train was being moved. The train was moving slowly, at a not greater rate of speed than two or two and a half miles per hour. There was no person on the car at the end of the freight train to keep an outlook upon the track ahead, nor upon the spaces between the tracks to give warning of the approach of the train; nor was there any person stationed for the same purposes at the point where persons were likely to be found, in the spaces between the tracks, when the passenger trains came in or out. A brakeman on the top of the third car from the end of the freight train, was the employe of the defendant nearest to the scene of the accident.

Defendant claims that there is no such street as Cotton street in the city of Shreveport; that what is called Cotton street is an open space appropriated for the tracks of its company by the City Council; that there are no sidewalks upon the so-called street, and no paths or ways for either footmen or vehicles; that it is occupied by a network of railroad tracks; that there is no indication to any one of the locality being other than a railroad track yard; that there is no place for the travel of either vehicles or foot passengers along the street and it is in fact not traveled.

Cotton street, so called, is in fact during a part of its length almost exclusively used for railroad purposes—tracks with spaces between the tracks covering almost the whole width of the streets, but the fact remains that from a legal standpoint the tracks are laid in the public street of the city, and that from a legal standpoint the general public have a legal right of passing along and over the street.

The right of occupation granted to the defendant company by the City Council, along the street, was granted subject to, and was received subject to the rights of the public, along and over the same, but the rights and obligations of the latter were modified to some extent by the grant to the railroad company. We can not deal with the accident under inquiry in this case, from the standpoint of Lampkin's having occupied when he was killed the position of either a trespasser or a licensee. Defendant introduced a number of witnesses to prove the fact that the getting on and off the train of passengers at or about the Spring street bridge was in opposition to the wishes of the railroad companies, and contrary to the instructions given to their conductors, but that fact is an irrelevant one in this particular case, where the party who was killed

had not been a passenger on their trains, nor was he attempting to be-come such. The important question is whether persons were *accus-tomed, rightly or wrongfully as a fact,* to congregate at this particular place and by so doing, made it a point of danger to life and limb. We think the evidence establishes that it was a danger point and that the parties operating trains had every reason to believe and know that it was such, and that they were called upon to govern their actions accord-ingly.

Defendant urges that it would be unreasonably onerous to force it to place flagmen or policemen on the streets, or to place a brakeman at the rear end of each backing car or train, as it is constantly making up or breaking trains and moving them at all hours in different directions; that there is no conventional or statute requirement upon it to do so.

It may be true that the city, in granting defendant its right to lay its track upon the street, did not impose upon it these obligations and that they were not imposed on it by general ordinance or statute, but there are certain obligations upon railroad corporations which exist independ-ently of convention or ordinance or statute. There is a duty imposed upon every one, whether natural persons or artificial persons, to avoid by proper care doing injury to others through their fault. (C. C. 660-2315.)

In Hamilton vs. Railroad Co., 42 Annual, 824, this court said: "that in running a train backward through streets, the engineer should see that the brakeman is at his post and keep a lookout on the track to warn in case of danger. It is the duty of the fireman to ring the bell con-tinually while passing through a town or village; that it would not give its sanction to the least absence of an employee of a railroad, when a serious accident happens while passing through a street of a town; that the danger to human life was too great, and employees to be relieved from all responsibility must be at their posts." We have on several occasions repeated this same caution.

We have declared that the greater the danger to the public the greater should be the vigilance exercised and precautions taken to avoid it. If railroad corporations passing through the streets of a city fail to exer-cise any vigilance and to take any precautions by reason of the pecun-iary expense which this would entail, they must be made to know that they assume the risks of resulting accidents and must take the legal consequences of their balancing the chances. Defendant urges in this particular case, that even had there been a brakeman upon the rear end

of the backing train at the time of the accident, the deceased placed himself in a position of danger so shortly before he was struck and killed, that the brakeman could not have possibly avoided the accident by anything he could have done. That proposition is by no means established as a fact, and it a dangerous course for the companies to pursue to fail in their duty, and to then argue that no good would have been accomplished had the duty been fulfilled. The proper course is to perform the duty, leaving results to be actually tested by the facts of each special case.

The evidence does not show that there exists on Cotton street any point specially dangerous other than this particular place, at or near the Spring street bridge, and it would have been no very onerous obligation upon the defendant to have stationed a man or men at that place, to secure the public safety. It may be true that an accident might happen anyhow, but none the less the defendant should have taken precautions to avoid it, and to minimize the danger, which would serve them in good stead. The record does not show how many persons were at this particular point when the accident occurred.

This case resembles in a number of its features that of Downing vs. The Southern Pacific Railroad Company recently decided by this court. In both cases there was the killing of a man for want of proper precaution by the backing down of a freight train. In both cases the freight train moved opposite a danger point in the streets of a town simultaneously with the passing of a passenger train upon a parallel track, when the attention of persons standing along or between the tracks would be likely to be attracted by the passenger train, and when the noises from the passenger train would be likely to conceal the approach of the freight train. In both cases there was a failure on the part of the parties operating the freight to exercise proper care and take proper precautions while moving it backward upon the track, to give notice of its approach and to warn parties standing on or near its tracks of their danger.

In the Downing case there was no evidence before the court showing the circumstances under which the railroad tracks had been placed in the street and whether the title of the land upon which the tracks were laid, was in the railroad company or in the public, and therefore whether the party killed was or was not a trespasser or a licensee, but in the present case the deceased was unquestionably upon a public street and not on defendant's track when killed and he was neither a trespasser nor a

licensee. In the Downing case the deceased was standing on or near a practically abandoned spur track on which he had no reason to apprehend the approach of a moving train, while the parties operating the freight train had reason on their part to believe that there would be danger, for parties standing where the deceased was standing, while in the present case both the deceased and the parties in charge of the freight train must have known or be presumed to have seen and known of the dangerous character of the situation and *each and both* held to increased care and vigilance.

The defendant insists that the deceased was backing towards the freight train and was still moving when he was struck and killed, and if not actually moving he had just come to a halt; that while the space between the tracks was sufficient for safety, yet the space over which he backed was short and they could not anticipate he would move into danger. It sought to establish that deceased was not struck by the first, but by the second or third car of the train, but this contention it did not sustain.

There is, as usual, a conflict of evidence as to the circumstances under which the deceased came to his death. Mercer, a farmer, living in Bossier parish (plaintiff's witness), testified that he was a passenger that day on the incoming passenger train of the Red River Valley train, and was sitting and looking out of the window, on the side of the car towards where the deceased was killed, the side next to the defendant company's switch (sidetrack); he was about a car's length from the deceased when he was struck; he saw him just as the train struck him; the first he noticed. the boy seemed to be standing with his back to the defendant's train and he was struck; saw him just about the moment that the train struck him; he was standing with his back to the track of the defendant company, which was parallel to that on which witness was and parallel with main line of the defendant company. He seemed to be looking at the Valley train as it ran in on the main line. He had his face towards the Valley train and his back was towards the track the other train was on. He saw the collision; he might have noticed the boy before, but did not pay any attention to him; the train seemed to strike him on his side. The defendant's train—a freight train—was backing towards the east, towards the railroad bridge over Red river, the Valley train was moving to the west—going into the city. The Valley train was moving very slowly, it had nearly come to a stop. Two brakemen came up along the ground by the side of the track, after the

deceased was struck, but not before; there might have been some one on top of the car, but witness did not see any one; he was not paying any attention to it until the man was struck; he did not notice whether the train on which he was, was making a noise at the time; the only noise it could have made at the speed it was going, was the escaping of steam.

The defendant's train was moving very slowly; it was nearly at a stop and did stop in about a car's length; it was a long freight train; he could not tell whether there was a ringing of the bell on defendant's train: There are freight and switch engines and trains moving in the yard nearly all the time; the yard is filled up with tracks; witness has seen a policeman at the point since the accident; was told he had been placed there to keep people from getting off the train.

Tom Pattison, a drayman in the employ of Dreyfous & Co. (plaintiff's witness), was at the defendant company's track right below the Spring street bridge when the deceased, Norman Lampkin, was killed; he was sitting on his wagon which was facing the Red river; he was looking at the Valley train. The boy was standing there looking at the Valley train coming in; he was standing a little too close to the Valley train and so he backed back, and just at that time, the defendant's train was coming, one car under the bridge, and the boy backed a little too far and this train knocked him down. He backed until he was near enough for the front advancing car to strike him and pass between witness and the boy; the latter had his face towards the Valley train at the time this train struck him, his back being towards the one that struck him. The backing car was about twenty feet from the car when he stepped back; there was no one at all on the advancing front car— which was the one that struck him; witness heard no one call out to him or give him warning to get out of the way; never heard any one say anything to him and never saw anyone there; did not hear the man make an outcry; witness made a mark on the map introduced in evidence showing the place he (the witness) was at when the accident occurred.

The following questions and answers were asked and answered by this witness on cross-examination:

Q.—If this man who was struck by the train had not stepped back just as he did, this freight train would not have struck him, would it? A.—No, sir; I reckon not.

Q.—It was his stepping back then that put him in the way of that freight train which hit him? A.—Yes, I reckon so.

Q.—In other words if he had stayed where he was before stepping back, he would not have been struck—but would have been clear of both trains? A.—I do not know, sir.

Q.—Was there space in there sufficient for persons to stand with safety between the two trains? A.—Yes, sir.

Skirring, the engineer on the Red River Valley train, testified that as the train on which he was approached the bridge on Spring street, the deceased was sitting near the end of the sill the uprights stand on, under the bridge, talking to another man. They both got up and the man killed was ahead of the other and stepped right in front of his (witness') train facing it—with his back to the approaching train of the defendant company, and went sideways towards that track. There were two coaches on witness' train that morning and his engine was right under the bridge and stopped.

When the engine passed him the man was all right, walking down the track (open space?) towards the sidetrack of the defendant company. As the train approached the head car hit him on the shoulder and knocked him down. There was plenty space enough between the two tracks for him to have been safe if he had not gone too far; just before he was struck the man was clear of the car; while the train was still moving he stepped in the way and it struck him; he had his back to that train and was looking in the direction of the Valley train; just before he was struck he was entirely clear of the defendant's train; he was not on the track at all—he was between the two tracks and entirely clear of the tracks until the defendant's train got within six feet of him he supposed and he was still going sideways stepping toward that sidetrack, getting further away and walking into the defendant's track. He was clear of the track until the train got within six feet of him and it was moving towards him all the time, and while the train was moving and he was going on to the defendant's track, they could not have stopped it.

It would have been impossible for them to have done so; they could not have done more than they did; when the train was moving the trainmen could not have stopped it in time to have prevented hitting him if there had been one hundred men on the train. Trains were backing in there all the time; when the man was struck he was looking up towards the Red River Valley train; he was kind of walk-

ing sideways. The engine was under the bridge, when the accident occurred; he had walked down some little distance towards the river; he was about middle ways of the front coach of the valley train; he was about twenty-five feet from the engine. Both trains were making a noise at the time. Freight cars in particular make a noise when in motion.

Plaintiff's counsel refer the court in support of their claim, not only to the case of Hamilton heretofore noted, but to that of Gurley, 40 Ann. 810; Peyton vs. Texas & Pacific Railroad Co., 41 Ann. 861; Conway vs. The New Orleans City and Lake Railroad Co., 51 Ann. 146; Banner vs. Shreveport City Railroad Co., 47 Ann. 1218; Sherman & Redfield on Negligence, Vol. 2, Secs. 471-484; 16 Hunn. 415; 76 Hunn. 29; 58 Ann. 672; 95 Mo. 232; 16 Md. App. 548.

In the Gurley case this court declared that a railroad company running and operating its road through the streets of a populous city, is bound to observe extraordinary precautions for the safety of the public, particularly at street crossings.

We are of the opinion that the defendant company was guilty of negligence in backing the freight train down its track, past the point in question, under the circumstances disclosed by the testimony in this record, without having provided and taken precautions to notify parties who might be standing or walking there or along on its track, of its approach and warn them of their danger.

We have next to ascertain whether the plaintiff's action or inaction in the premises, barred the right of recovery.

Plaintiff contends, that even if there was contributory negligence on the part of the party injured, recovery will not be defeated if there has been a plain disregard of that ordinary care on the part of defendant, which if exerted would have averted the accident, causing the injuries for which damages are sought, and he cites in support of this position, Kramer vs. Railroad Co., 51 Ann. 1693; Rice vs. Railroad Co., 51 Ann. 108; Maguire vs. Railroad Co., 46 Ann. 1543; Nelson vs. Crescent City Railroad Co., 49 Ann. 491; 139 U. S. 558; 144 U. S. 419; Conway vs. The New Orleans City & Lake Railroad Co., 51 Ann. 146.

In Herlisch vs. Railroad Co., 44 Ann. 280, this court declared that on approaching a street crossing of a railroad track in a city, it is the duty of a traveler to exercise his senses of sight and hearing and look and listen for an approaching train. That his failure so to do is negligence which in case of collision will prevent his recovery of damages for

injuries received. (In the consideration of the case it will be observed that the plaintiff when struck by one of defendant's engines, was on de-fendant's track which was laid upon its private property.) In the course of its opinion this court said it was satisfied that defendant's employees were neglectful of their duties under the general principles of law, as well as under the ordinances of the city, in reference to keep-ing a flagman at the street crossing; the exhibition of a red light, etc., and that the evidence rendered it exceedingly doubtful that a bell was rung or a whistle sounded; that taking it all in all, the evidence made out a case of negligence on the part of the company. That they were evidently unmindful of the rights of pedestrians who had equal rights to use this crossing. The court was of opinion, however, that the plain-tiff was himself guilty of negligence which directly caused or contrib-uted to the accident by which his injuries were inflicted, and declared that the rule was a fair and reasonable one which required of travelers who resort to thoroughfares of a city, over which railroads have a right of way, to exercise the greatest possible care to avoid collisions with their trains; that ordinarily the fact that the train neglected to make statutory and customary warnings, did not relieve a person approach-ing an open crossing from the duty of looking out on approaching the road.

The court quoted approvingly an author who summarizing the duties of railroad companies and travelers respectively, in respect to public crossings at the intersection of public streets, said: "At the place of in-tersection there are concurrent rights. Neither the traveler on the common highway nor the railroad company has an exclusive right of passage. Even on a common road travelers must look out for the ap-proach of other vehicles, and this is the more necessary at a railroad crossing, because movement on such a road is more speedy, and because the consequences of such a collision are usually disastrous. Precaution —looking out for dangers—is therefore a duty. (Thompson on Negli-gence, p. 403, Railroad Co. vs. Hellman, 30 Pa. St. 464.)

In Conway vs. The New Orleans City & Lake Railroad Company, 51 Ann. 146, this court was of opinion that there was no proper care on the part of the employee in charge of defendant's electric car; that such care must be exercised at dangerous places on a railway to avoid inflict-ing injury, as the proper manning of a car requires. The plaintiff, in that case, in order to board an electric car whose stopping place was on its track in the neutral ground on Canal street, between Baronne and

Carondelet, walked to this stopping place from the Baronne street cross-ing along the open space on the neutral ground between the track of the defendant company and a parallel track of the same company. It was All Saints' Day, and cars were constantly passing on this parallel track. The tracks were so close together that a person standing between the two when two cars passed each other, was almost certain to be injured. The plaintiff was struck when in the act of getting into his car, by the overlapping side of a car passing at that time, on the other track and coming up behind him. Plaintiff, before leaving the Baronne street crossing, had looked to see whether there was a car coming up on the other track, but did not look back after he had once started between the tracks on the neutral ground.

In reference to the plaintiff's conduct, the court said: "The plaintiff did not, at the moment, suspect the threatening danger. He admits had he looked he would have had no trouble in seeing the approaching car. There was forgetfulness on his part it is true, just prior to the accident in his listlessly walking as he did; whether it was enough to defeat the right of recovery is a question to be hereafter determined. Even if one should usually 'look and listen', yet if the servant *should* have seen the danger, it is negligence not to have seen it and applied himself as far as possible to avoid the accident. Moreover the plaintiff was on the passage way from which passengers board the train. These reasons we think take the case out of the rule requiring one 'to look and listen' * * * not to have seen the plaintiff walking on so danger-ous a place was culpable negligence. It must be borne in mind that passengers were invited to board the train from the space over which plaintiff was walking at the time. It devolved upon the employees of the defendant company to be careful; to run slowly at this place and to look on the entire front of the advancing car and to exert a timely care toward protecting persons in dangerous proximity to the car. The space having been reduced by defendant's car from four and a half feet to eighteen inches, it devolved upon its employees to be careful and watchful. It does seem that with ordinary prudence and watchfulness the plaintiff would have been seen by one in charge of the advancing car. Not to have seen him, in our judgment, makes it evident there was a want of even ordinary care. If the employee had exercised the care re-quired, the accident might have been avoided. It certainly devolved upon the defendant's agents to carefully look. Any other rule would afford scant protection to the public and give protection to indifference

where there should be watchfulness. There can be no serious objection to the nearness of the tracks to each other. It is unavoidable; none the less if a proximate track give rise to more than ordinary danger, such danger should be met by corresponding precaution. Instead of care and caution which should have been exercised in passing the steam train, the record shows that the motorman never saw plaintiff, who was walking in a dangerous path between the cars; that there was no sounding of the gong nor the least warning of approaching danger. The defendant's employees upon such an occasion, particularly where there are many passengers and a number of people on the street, owed to the public reasonable care and diligence. It was the duty of this motorman to be on the constant lookout when passing the narrow strip between his car and the West End train at the stopping place of the latter; the time —about midday in November—the place—a dangerous way where passengers frequently boarded the train which plaintiff was seeking to board; the duty to be on the lookout and give warning when there was danger of accidents, all made it obligatory upon the motorman to be upon the alert. By the use of ordinary care, might not the defendant have known that plaintiff was in an exposed position which rendered it proper to give warning at this particular place, and even at this particular place, check its car a little? In our judgment there was not sufficient care and caution taken to avoid the accident, and in consequence we think that the defendant is liable.

"Plaintiff, it is true, was in an exposed position which called for more than ordinary prudence in his movements, yet he was invited to the place where the accident occurred and notwithstanding a slight inattention he should not have been subject to the risk of severe injury by the negligence of the motorman."

In the Conway case the defendant company had a person on guard to see and give warning and to take precautionary steps; but he did not see; in the case at bar there was *no person at all placed on guard* to see and give warning; and as a matter of course no one saw Lampkin's danger and no one gave him warning. There was this difference, however, in the situation of the deceased and the defendant. There was an open view for over a block of the present defendant's track from Spring to Market street and its train was approaching very slowly so that the deceased had ample time to look up the track to ascertain likelihood of danger, while the space between the two tracks on which

Lampkin had gone, was only a few feet wide and he could pass from a situation of safety to one of danger in a few seconds.

The jury by a vote of ten to two rendered a judgment in favor of the defendant.

Counsel refer to the verdict of a jury in favor of a corporation as being an exceptional fact, and urge upon us the great weight which should be given to it, but we have to examine the record ourselves and determine from that examination whether the jury erred or not. For the same reasons which have impelled us to reverse or modify the verdict of juries when adverse to corporations, we must reverse or modify them when rendered wrongly in their favor. After mature deliberation we are of the opinion that the verdict rendered in this case cannot be sustained. We are of the opinion that the death of Lampkin could have been, and doubtless would have been avoided had the defendant company, while running its train through the streets of a city, exercised the care and used the precautions which proper regard for the public safety of the individuals therein called for.

For the reasons assigned: It is ordered, adjudged and decreed that the verdict of the jury be set aside, and the judgment rendered therein be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that the plaintiffs herein do have and recover from the defendant, J. H. McCormick, in his capacity of receiver of the Vicksburg, Shreveport and Pacific Railroad, the sum of twenty-five hundred dollars, with legal interest thereon, from the date of the judgment herein, until paid, with costs in both courts.

