## DOWLING v. TEXAS PACIFIC–MISSOURI PACIFIC TERMINAL R. CO.
### No. 14590.

Court of Appeal of Louisiana.   Orleans.
April 23, 1934.

Edw. Rightor and Wm. H. Sellers, both of New Orleans, for appellant.

Lemle, Moreno & Lemle, of New Orleans, for appellee.

WESTERFIELD, Judge.

Mrs. Lula Tindall Dowling brought this suit against the Texas Pacific-Missouri Pacific Terminal Railroad Company of New Orleans, claiming $30,588.80 as damages for the death of her husband, which is alleged to have been caused by the negligence of the defendant company. The case was tried before a jury, which brought in a verdict for defendant. From a judgment based upon that verdict, plaintiff has appealed.

On the 2d of January, 1931, Dr. Oscar Dowling boarded a passenger train of the Texas Pacific Railroad Company at 9:30 p. m., with the intention of journeying to Shreveport. At a point about nine miles above the city, Dr. Dowling's train was placed on a ferry known as the L. S. Thorne for the purpose of transporting the train across the Mississippi river; the defendant corporation being the operator of the ferryboat. When about midway of the crossing, Dr. Dowling was seen to alight from the sleeping car in which he had reserved a berth to the deck of the Thorne apparently for the purpose of enjoying the fresh air. He was seen by the captain of the transport to lean against one of the lifeboats shortly after emerging from the sleeper, and, so far as the record discloses, was not seen again alive by any one. His body was discovered by a member of the crew of the boat about two hours after his train had been removed. When found, Dr. Dowling's body was lying across one of the rails on the boat, face downward, and completely severed in two at a point near the pelvis, as a result of its having been rolled over at least by one train and probably two, for there had been two freight trains on the ferryboat between the time of the removal of Dr. Dowling's train and the discovery of the body, and the rails on which his body was found had been traversed by sections of those trains.

The charge of negligence against the defendant is based upon the alleged insufficiency of illumination and improper policing of the boat and the failure to maintain a guard or watchman in the interest of safety of the passengers, and further because of the failure to have a lookout, or a member of the switching crew, riding on the rear of the first freight car that was backed upon the ferry.

There are three tracks on the L. S. Thorne, all of which were occupied with Dr. Dowling's train when he was last seen upon the boat. The sleeper in which he had been riding was on the starboard, or right side of the boat, and the track on which his body was found was on the port, or the left side of the boat, almost opposite the point where Dr. Dowling left the sleeper. The rails of the Thorne are elevated about eighteen inches above the deck. Dr. Dowling must have reached the other side of the boat by a pathway around the bulkheads, or buffers at the end of the rails. He could not have crossed over the rails because of the presence of the cars. How he happened to be upon the rail, which train first rolled over him, and whether he was alive or dead at the time, is unknown. Since all three tracks were occupied by coaches while his train was on the boat, it is unlikely that he was

rolled over by any part of that train, though it is possible for him to have voluntarily placed his body between the wheels, or to have in some way, by some unaccountable means, have accidentally fallen, and, in an effort to regain his equilibrium, his body may have been projected beneath one of the cars as it was being removed from the boat. It is more probable, however, as both counsel apparently concede, that he remained on the ferryboat after the departure of his train, and was rolled over by either the first or second freight train—one or both—which is known to have traversed the track on which he was found.

In so far as the charge that the boat was insufficiently lighted is concerned, while the record indicates that the spot where the body was found was the darkest place on the boat, due, perhaps, as one witness suggests, to the fact that it was within the shadow of the pilot house, other parts of the boat seem to have been properly lighted. We cannot say that the situation required the employment of a special watchman to look after the safety of the passengers on the boat. It is true that it was customary for the passengers to get out of their coaches and stand or walk about the deck of the transport during the crossing of the river; however the only danger to be apprehended was the remote possibility of their falling in the river, since the coaches were stationary on the tracks on the ferryboat, while it was in motion, and passengers could hardly be expected to be out of their coaches when the ferryboat stops at the other side and the process of removing the train begins.

The evidence is to the effect that it is customary for a switchman to ride on the first car at the head of a moving column of passenger cars when they are being pushed on the boat, but that, in the case of a freight train, this practice is not indulged. There was therefore no guard on the freight trains, but it could not be reasonably anticipated that any one other than a member of the crew of the boat or train would be on the transport at the time a freight train was being ferried across. However, assuming for the sake of argument that the defendant was negligent in one or all of the particulars charged, the matter could only assume importance when and if such negligence be shown to be connected with the death of Dr. Dowling as a proximate cause. His body was found lying across the rail, where it had been placed voluntarily or involuntarily, intentionally or accidentally. It is the theory of defendant that his death was suicidal, or, if unintentional, that it occurred before the wheels of the freight trains crushed his body by reason of an apoplectic stroke, or some other sudden ending. Dr. Dowling was 62 years of age and weighed 210 pounds. He had been an oculist of considerable prominence in the city of Shreveport, La., giving up his practice in that city to assume the duties of president of the Louisiana state board of health, which position he occupied for a number of years. At the time of his death, he was out of public office and private practice. He carried life insurance to the extent of about $20,000, $5,000 of which was taken out just before he boarded the train for Shreveport. It is suggested that the contemplation of his financial situation may have induced him to place his body upon the track with the deliberate purpose of self-destruction in order that his wife might collect the insurance. In the words of the able counsel for defendant, "the high character of the man, his high sense of responsibility, his great pride and his undoubted courage would make this last course seem not improbable. If he did it, it was not the act of a coward, but the set purpose of a big man to be no charge upon those he loved. It would be the act of a man in search of a means of discharging natural obligations, even at the cost of his own life." This conjecture, it is said, is fortified by the fact, as testified to in the record, that a passage of the wheels of the train over his body would cause instant death, a fact of which Dr. Dowling, because of his medical knowledge, must have been aware.

The vital organs of Dr. Dowling were submitted to microscopic examination by eminent pathologists, who found certain abnormalities. These learned experts, however, do not agree in their conclusions as to the cause of his death. One of them testified that his heart was hypertrophic (enlarged), weighing 530 grams, as compared with a normal weight of 360 grams for a man of his size. This expert stated that, "if Dr. Dowling had fallen dead on the street and an autopsy held on his body, it would have unquestionably been determined that he died of coronary sclerosis, with its resulting effect." Another expert expressed the opinion that Dr. Dowling did not die of heart disease, but was alive at the time the train rolled over him, but added that "only God almighty knows."

The position of the plaintiff is that, having shown that the doctor was in good health shortly before his body was rolled over by the train in a manner sufficient to kill him,

a presumption arises that he was alive when his body was crushed by the train, which can only be overcome "by positive proof brought out by the defendant that he died from disease and not from accident." Duvall v. La. Western R. Co., 135 La. 193, 65 So. 104, and authorities there quoted. We believe this to be a correct statement of the rule to the extent that, "a given state of affairs being shown to exist, it will be presumed to continue for a reasonable time." Chamberlayne, Evidence, par. 1030, cited with approval in Duvall v. La. Western R. Co., supra. It is therefore fair to assume that Dr. Dowling, who was seen in apparent good health while the ferryboat was in the middle of the Mississippi river, continued in that state of health for a reasonable time thereafter. Whether the presumption would continue up to the time the train ran over his body is another matter, because we do not know when the first train rolled over him. All that we can say is that it was some time within two hours after he was last seen alive. It might be that, if he voluntarily remained upon the ferryboat after the departure of his train, as was most probably the case, a different presumption would arise from the circumstance of his having no reasonable purpose in doing so. But, if he was alive when his body was severed by the car wheels, it does not follow that his death was due to the negligence of the defendant, for the mere fact that the wheels of the train killed him would not alone be sufficient to charge the defendant with responsibility therefor. He may have imprudently attempted to cross the track at a time when to do so would involve the grossest negligence, or he may have accidentally tripped over the track in attempting to cross the ferry under circumstances which would render it impossible for the crew of the train to have seen him in time to avoid the accident, even though a lookout was present on the box car forming the front of the approaching column, and notwithstanding the utmost care on the part of the other employees of defendant.

The doctrine of the last clear chance which is invoked by plaintiff's counsel under the authority of the leading case of McClanahan v. Railway Co., 111 La. 782, 35 So. 902, and others following the doctrine of that case (Jones v. Chicago, R. I. & P. R. Co., 162 La. 690, 111 So. 62, Rogers v. L. R. & N. Co., 143 La. 58, 78 So. 237, and Tyer v. Gulf, C. & St. F. R. Co., 143 La. 177, 78 So. 438), is not applicable here, because there is no proof that any one connected with the movement of the train saw Dr. Dowling on the rails at a time when the train could or should have been stopped in time to avoid the accident.

We cannot understand why Dr. Dowling should remain on the ferryboat after his train had been removed, or why, if accidentally and inadvertently left behind, he did not immediately make some effort to board the train after it had been taken ashore, unless he died or was killed before he had an opportunity to do so, a most unlikely occurrence, for, as we have heretofore observed, he could only have been killed by his train by throwing his body beneath its wheels, or by accidentally falling between the trucks of the cars.

On the record before us, it is impossible to say whether Dr. Dowling died as the result of an intentional or accidental occurrence, or by reason of his own negligence, or that of the train crew. The long and short of the matter is that his unfortunate death will forever remain a mystery, or, as the expert to which we have referred puts it, "only God almighty knows." In the absence of any explanation of his death involving responsibility of the defendant, there can be no recovery. The plaintiff's obligation is to establish his case with legal certainty, and this case, so ably presented by learned counsel on both sides, falls far short of that requirement.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.