(35 South. 902.)

No. 14,355.

McCLANAHAN v. VICKSBURG, S. & P. RY. CO.

(Nov. 17, 1902.)

RAILROADS—PEDESTRIANS—USE OF TRACK—
CONTRIBUTORY NEGLIGENCE—DUTY
TO DISCOVER—EVIDENCE.

1. Deceased, upon a clear day, whilst intoxicated, fell upon defendant's railroad track and became unconscious, whether by reason of striking his head against a rail or cross-tie, or from the fumes of liquor, does not appear. From the point at which he fell, near the confines of a small village and of the defendant's railroad yard, the track, for several miles to the eastward, was straight, built upon an embankment, through open fields, with a grade slightly descending to the westward, and was entirely free from obstruction. The middle of the track was commonly used as a footpath and was clear of grass. The grass between the path and the rails was dead and yellow, and was not higher than the rails. The body of the deceased, weighing about 150 pounds, wrapped in a gray overcoat, lying, extended from the path across to, and with one leg over, the north rail, was not an inconspicuous object, and in that position was run over by a train from the eastward, consisting of an engine (from which steam had been cut off), a caboose, and 17 freight cars, and was moving, in view of its approach to the village and to the defendant's railroad yard, merely by acquired momentum, at the rate of 15 or 18 miles an hour. The engine and 5 or 6, only, of the cars were provided with air brakes. The train crew proper consisted of the conductor, who was in the caboose, the engineer, the fireman, and three brakemen; but one of the brakemen was absent, another was in the cab of the engine, and the third was unaccounted for at the moment of the accident, and no hand brakes were applied.

Held, that the defendant is liable in damages—the organ of the court being of opinion that, under article 272 of the Constitution, declaring all railways public highways, the deceased was not a trespasser, and that the defendant could, and should, more promptly have discovered his presence and peril, and that its failure to do so, supervening upon his previous negligence, was the proximate cause of the accident; the Chief Justice and Mr. Justice Breaux being of opinion that, though the article of the Constitution does not affect the question, and the deceased may have been a trespasser, the defendant was, nevertheless, bound to use reasonable diligence in the matter of keeping a lookout, and that its negligence in that respect was the proximate cause of the accident, and Mr. Justice Provosty, who dissents, holding that the deceased was a trespasser, to whom, under the circumstances, the defendant owed no other duty than to use its best efforts to avoid injuring him, after discovering his presence and peril.

Provosty, J., dissenting.

(Syllabus by the Court.)

Appeal from Second Judicial District Court, Parish of Bossier; John Thomas Watkins, Judge.

Action by James M. McClanahan, tutor, against the Vicksburg, Shreveport & Pacific Railway Company. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

Harry H. Hall and Wise & Herndon, for appellant. Joannes Smith, Andrew Jackson Murff, and Rhydon Dickins Webb, for appellee. Gustave Lemle, Hunter C. Leake, and William Wirt Howe, amici curiæ.

### Statement of the Case.

MONROE, J. Plaintiff, as tutor of the minor children of H. T. Cahill, sues to recover damages resulting, as he alleges, from the negligent killing of the father of his wards. The defense is a general denial and a plea of contributory negligence. There was a verdict and judgment for the plaintiff in the sum of $12,500, from which the defendant has appealed; and the plaintiff answers, praying that the amount allowed be increased to $25,000.

The evidence shows that, having become intoxicated in Shreveport, the father of the minors, at about 3 o'clock in the afternoon of December 6, 1900, crossed over to Bossier City, a village lying upon the east bank of Red river, and, going upon the railway, which there runs east and west, continued walking eastward until he had passed a short distance beyond the limits of the defendant's railroad yard, when, as appears from subsequent events, he fell, and was thereafter, whilst unconscious, so injured by one of the defendant's trains that he died within a few minutes.

Those who saw him immediately afterwards observed that, apart from the injuries resulting from the accident, he had received a contusion upon the head, and that there was blood, dried and matted, in his hair, from which the inference is drawn that, in falling, he was knocked senseless. Upon the other hand, it is possible that he remained where he fell because overcome by liquor. Be that as it may, when the train came, about half past 4 o'clock, he was still lying upon the track, with one leg over the north rail, and possibly one arm over the same or the other rail. The road near the scene of the accident is straight, and the engineer had an unobstructed view of the track, which is a good deal used by pedestrians for several miles. The deceased was 5 feet 6 inches in height, weighed about 140 or 160 pounds, and wore an overcoat. The train consisted of an engine and tender, 17 freight cars, and a caboose, and, steam having been cut off,

in view of the approach to the village and railroad yard, was carried along by previously acquired momentum, aided by a slightly descending grade, at the rate of 15 or 18 miles an hour. Whether the cars were loaded or empty is not shown. The engine and 5 or 6, only, of the cars, were provided with air brakes. The train crew, proper, consisted of the conductor (who was in the caboose), the engineer, fireman, and three brakemen; but one of the brakemen was not on board at the time, another was in the cab of the engine, and the third is unaccounted for until after the accident. The only witnesses who testify as to the position of the deceased immediately before the accident are the engineer, the fireman, and the brakeman who was in the cab. The engineer states that when within 10 car lengths, or, say, 330 feet, he discovered an object on the track, which he at first thought was a crosstie or piece of timber, and that it was only when he was within 4 or 5 car lengths of it, or, say, 165 feet, that he recognized it as the body of a man, which he says was lying close inside of, parallel with, and with the left foot and leg almost over, the north rail. There are disinterested witnesses (passengers) who testify that the engineer stated immediately after the accident, and whilst the body was being removed, that it had been lying across the track, that the fireman illustrated the position by himself lying down upon the track, and that it was said by one of the train men that they were "right on it" before they noticed it, whilst the fireman testifies positively that the leg of the deceased was across the north rail, and his head near the middle of the track, "between that and the north rail," and the brakeman testifies that the arm and foot were across the rail, with the body "between the little dirt path and the rail." These two last-mentioned witnesses learned that there was something on the track only when their attention was attracted by the engineer's signal, and they substantially corroborate his testimony as to the distances. The engineer further states that when he first discovered the object he reversed the lever of his engine, applied the air brakes, and sounded the danger signal, but that he was unable to stop the train within the intervening distance, and that it ran about 6 or 7 car lengths, or, say,

231 feet, after the accident. Upon the other hand, there are witnesses who testify, from measurements made during the same afternoon of blood stains on the track, that the body of the deceased was dragged 160 paces, or 480 feet. It is not pretended that any of the hand brakes were applied, but the engineer, being asked, "In what distance, if your air brakes are in operation, and with your flagman and brakemen in the caboose, being at his place, all brakes being applied at the proper time, could a train of fifteen or sixteen cars be stopped—an emergency stop?" answers, "About the distance that was done there. All was done that could have been done."

Being asked why he failed to discover and distinguish the object at a greater distance, he answers, in substance, that he supposes it was because, not making steam, all smoke descends, because there was a down grade, and because the deceased wore gray clothing, which was about the color of the grass; his testimony suggesting the idea that the conditions named might have prevented the earlier discovery and recognition referred to in the opinion, but not being given with any apparent certainty of conviction that they, or either of them, as a matter of fact, had so operated. The fireman, answering substantially the same question, mentions neither smoke nor grade, but says that the clothing of the deceased was about the color of the grass, that the latter was higher than the rails, and that his attention had been attracted by some laborers in a field near by, who seemed to be trying to hail the train. There are other witnesses from whose testimony it appears that the weather was clear and dry; that the grass on the track was dead and yellow, and not higher than, if as high as, the rails; that the deceased was 38 years old, and was earning $2 or $3 a day; and that his minor children are two little girls, aged 9 and 7 years, respectively, whose mother is dead, and who are left entirely destitute.

### Opinion.

It is not negligence per se for a man in sound health, and in full possession of his faculties, to enter upon a railway, or, if there be negligence in a particular case, he may, perhaps, exhaust it in the making of such entry; but when he voluntarily becomes intoxicated to the extent that it is uncertain whether he can maintain his equilibrium, or can rise if he should fall to the ground, a road over which steam trains are passing is not one which he should select to make use of as a highway, and, since his falling and remaining where he falls are to be expected, neither is to be excused by his intoxication. Cahill's presence and helpless condition on the defendant's railway at the moment that he received his injury must therefore be attributed to his own negligence.

One may not, however, injure or take the life of another for the negligence, or even for the trespass, of the latter, or for both; hence, when the defendant, through its agents, became aware that a man was lying apparently unconscious in front of its moving train, it at once became charged with the duty, which it owed to him individually, even though he had been a trespasser negligent of his own safety, of using the utmost diligence to avoid the infliction of injury upon him; and, by its failure to discharge that duty, the question of diligence, whether upon the one side or the other, as also the question of trespass, would have been eliminated, and the infliction of the injury would be regarded not as the result of accident, but as the accomplishment of a willful and criminal, or quasi criminal, purpose.

In those jurisdictions where a person so situated as was Cahill is held to be a trespasser, the right to recover for injury sustained is denied, except in cases such as that last above stated; the doctrine applied being that the owner of the road is under no obligation to keep a lookout for trespassers, and owes them no duty, save to refrain from injuring them after being informed of their peril.

In some other jurisdictions it is held that the duty of keeping a lookout for objects and obstructions on the track, which is imposed, in the interest of employés, of passengers, and of the nontrespassing public, upon those who operate railroad trains, inures also to the benefit of trespassers.

In this state the Constitution (article 272) declares that all railways are "public highways," from which it follows that, though intended primarily for the purposes of the

corporations by which they are built, the public have certain rights with respect to their use; and, whilst it is unnecessary at this time to consider more particularly the extent of those rights, it also follows that Cahill, in going and remaining, however negligently, upon the railway of the defendant, was not a trespasser, and hence that the defendant owed him not only the duty of using the utmost diligence, after the discovery of his peril, to avoid injuring him, but that it also owed him the duty of using proper diligence in the matter of making that discovery, and that its failure to use such diligence would be negligence.

It appears from the evidence in the record that, as soon as he discovered the "object" on the track, the engineer did all that he personally was able to do to stop the train; but his efforts were necessarily limited to the reversal of the lever of the engine, the application of the comparatively few air brakes that were under his control, and the sounding of the signal for the hand brakes. It may be that the brakemen did all that they could, situated as they were, but they had disabled themselves from doing anything of consequence. One was not on the train, another was in the cab of the engine, and the third is unaccounted for until after the accident. And none of the hand brakes were applied. Pretermitting, however, the question whether, if all the brakes had been applied immediately upon the discovery of the object on the track, the train could have been stopped before the infliction of the injury, the inquiry presents itself, whether there was any omission of duty in the making of the discovery. There is no denial of the fact that, unless prevented by some of the conditions to which he refers in his testimony, the engineer, exercising the diligence demanded by the situation, could have made the discovery in good time to have stopped the train by the use of the air brakes alone; and it appears that, of those conditions, one, though real, was insufficient, and the others existed only hypothetically. Thus the slight grade in the road could not have obstructed the engineer's view of the track. The theory of the descending smoke is propounded by him alone, but, in his direct examination, rather as a possibility than a fact, and it is

only upon his cross-examination that he makes anything like a positive statement on the subject, his testimony, as a whole, lacking the assurance of conviction, whilst the fireman, being asked substantially the same question, i. e., why it was that the object on the track was not sooner discovered, gave other reasons, but did not mention the smoke. Upon this testimony, we are unable to accept it as proved that, with a train moving at the rate of from 15 to 18 miles an hour, even though the steam had been cut off, there was not a sufficient current of air created to have prevented the smoke of the engine from enveloping it and obscuring the view ahead. The effort to show that Cahill's body was concealed by the grass, or was indistinguishable on account of the color of the clothing, is equally unsustained. Summarizing the facts disclosed by the record, at the risk of some repetition: The railway was straight for several miles in the direction from which the train approached the scene of the accident, and was built upon a slight and almost level embankment, through open fields, with no trees or shrubs upon either side. The middle of the track was used as a footpath by the people of the village, and was free of grass. The grass between the footpath and the rails was dead and yellow, and was no higher than, if as high as, the rails. The day was clear, from which it may be inferred that the glistening rails afforded guides to the eye of the engineer with respect to anything on or between them. The body between, and partly on, the rails, weighing about 150 pounds, wrapped in an overcoat, which is said to have been gray, was not an inconsiderable or an inconspicuous figure, and was lying, not close to, and parallel with, the north rail, but, from a point near the footpath, across to, and with one leg over, the rail; thus breaking an otherwise bright and continuous line. Steam having been already cut off, the speed of the train was comparatively slow, affording ample time for observation; and the accident happened at a point outside the limits of a village whose inhabitants commonly used the track as a highway—a section of the road over which it was therefore the duty of the engineer to have been particularly careful, so that, whether he at once recognized the

object before him or not, it was his duty to have used his best efforts to stop the train as soon as he discovered it, since it was not improbable that it would prove, as it did, to be the body of a helpless human being. This latter duty he recognized, but the attempt to stop was made too late, because the discovery which suggested it was made too late. And in this connection it may be remarked that the brakeman who occupied the fireman's seat in the cab of the engine ought not to have been allowed to remain, as he could not there have discharged his own duties, and it is possible that he distracted the attention of the engineer. However that may be, the conclusion seems warranted that, with ordinary or proper diligence, the engineer might and should have made the discovery referred to in time to have enabled him to avert the accident, notwithstanding the negligence of Cahill.

The rule of law applicable to a case of peril threatening one of two parties, or both, is that an independent obligation rests upon each to look out for his own safety, and to see that no harm comes, through his fault, to the other, each being liable for the consequences flowing from his own breach of duty, with the qualification, however, that, if harm comes to one through the negligence of both, the consequences (except in admiralty) are not shared between them, but the injury remains where it falls, which qualification is, in turn, subject to the exception that if, notwithstanding the negligence of the one party, the other, by the exercise of ordinary diligence, can avoid the injury, or the infliction of the injury, but fails to do so, he alone must bear the consequences.

In Butterfield v. Forrester, 10 East, 160, the defendant, in order more conveniently to repair his house, which was near the roadside, obstructed the road with a pole; and the plaintiff, riding violently, whilst there was light enough to enable him to see the obstruction, came in contact with it, was injured, and sued for damages. Lord Ellenborough, in deciding the case, said:

"A party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he do not himself use common and ordinary caution to be in the right. In cases of persons riding upon what is considered to be the wrong side of the road, that would not authorize another purposely to ride up against them."

It will be observed that the principle involved in what we have called the "exception" is here applied to a case in which the negligence of the party injured supervened upon that of the other party to the accident, and that the court uses by way of illustration the case of one who "purposely" inflicts injury upon another for no better reason than that the latter has been guilty of negligence. The doctrine of the illustration had, however, long been established, from which it follows that the doctrine of the "exception" was intended for, and finds its proper application in, cases where injury results from negligence, rather than design, and where the negligence of the one party, supervening upon that of the other, becomes the immediate or proximate cause of such injury.

In the familiar case of Davies v. Mann, 10 Mees. & W. 546, it appeared that the plaintiff's donkey, his forefeet being fettered, had been turned out into the highway to graze, and was there run against and injured by defendant's wagon, driven at a "smartish" pace down a slight descent; and, an action having been brought to recover damages, it was held that the donkey was lawfully in the highway, but that, even if he had been wrongfully there, it would have made no difference, for, as the defendant might, by proper care, have avoided injuring him, and did not, he was liable for the consequences of his negligence; one of the judges (Parke, B.) saying, inter alia, "Were this not so, a man might justify the driving over goods left in the highway, or even a man lying asleep." The controlling idea in the determination of the case seems to have been, not that the defendant acted willfully, but that the situation of the donkey, though brought about by the negligence of the plaintiff, was so obvious that the defendant's negligence in failing to take it into account became itself the proximate cause, and gave to the negligence of the plaintiff the status of a mere condition, or at best of a remotely contributing cause, of the accident.

In Radley v. London & N. W. R. Co., L. R. 1 App. Cas. 754, subsequently decided,

the doctrine now frequently referred to as that of "the last clear chance" was more plainly stated, as follows:

"Though the plaintiff may have been guilty of negligence, and although that negligence may in fact have contributed to the accident, yet, if the defendant could, in the result, by the exercise of proper care and diligence, have avoided the mischief which happened, the plaintiff's negligence will not excuse him."

And "in Springett v. Ball, 4 Fost. & F. 472, which was an action for the death of a person who was run over by an omnibus as he was crossing the road, Cockburn, C. J., charged the jury that, even though there was some negligence on the part of the deceased in crossing the road, yet, if the driver could, by the exercise of reasonable care, have seen him in time to have avoided the accident, the defendant was liable, and would be liable if the driver would have seen the deceased but for the fact that his attention was diverted to his horses, owing to the absence of a skid which he ought to have had for use in going down the hill."

That the doctrine thus enunciated and affirmed by the English courts is strongly supported in this country, there can be no doubt. In Becker v. L. & N. R. Co., 61 S. W. 997, 53 L. R. A. 267, the Court of Appeals of Kentucky quoted with approval the following from Shear. & Redf. Neg. vol. 2, §§ 483, 484, to wit:

(483) "The rule stated in section 99, that the plaintiff may recover, notwithstanding his contributory negligence, if the defendant, after becoming chargeable with notice of the plaintiff's danger, failed to use ordinary care to avoid injuring him, has been enforced in many railroad cases. * * *"

(484) "The rule stated in the last section, however, does not cover the whole ground. The defendant is responsible not only for what he actually knows, but for that which he is bound to know. It is clear that the frequent statements that contributory negligence is a bar to recovery, except where the defendant's conduct has been 'reckless,' 'wilful,' or 'wanton,' or even grossly negligent, are not sound. No courts have, in actual practice, adhered to this imaginary rule. It has been explicitly overruled, and, indeed,

it has been explained away or disavowed by courts which had previously stated it."

Whilst, therefore, we have proceeded upon the theory that the only negligence of the present defendant consisted of its failure to use ordinary diligence in the matter of the discovery of the peril in which the deceased had placed himself, the case falls well within the rule sanctioned by the authority cited. That rule has heretofore been fully, or partially applied or recognized in McGuire v. R. Co., 46 La. Ann. 1543, 16 South. 457; Conway v. R. Co., 51 La. Ann. 146, 24 South. 780; Kramer v. R. Co., 51 La. Ann. 1693, 26 South. 411; Lampkin v. McCormick, Rec'r, 105 La. 418, 29 South. 952, 83 Am. St. Rep. 245. It has frequently been applied elsewhere in cases some of which are quite similar to this. Pickett v. R. Co., 117 N. C. 616, 23 S. E. 264, 30 L. R. A. 257, 53 Am. St. Rep. 611; Bogan v. R. Co., 129 N. C. 154, 39 S. E. 808, 55 L. R. A. 418; Werner v. R. Co., 81 Mo. 374; Kelly v. R. Co., 95 Mo. 279, 8 S. W. 420; Edgerly v. Street R. Co., 67 N. H. 312, 36 Atl. 558. And whilst this court is in no wise disposed to encourage intoxicated or other persons in the practice of lying down on railways, it must be applied here. To hold otherwise would be almost equivalent to holding that an engineer is in no case bound to see a human being lying on a railway in front of a moving train, even though such railway be a public highway. It is proper to say that most of the authorities which have been referred to in this opinion, and many others besides, are to be found collated in the valuable note to the case of Bogan v. R. Co., 55 L. R. A. 418 et seq., and that the foregoing quotations are in the language of the note.

Considering the age, habits, and earning capacity of the decedent, and the age of the minors, we are of opinion that the damages sustained by them may reasonably be assessed at $4,000.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the principal amount to $4,000, and, as amended, affirmed; the plaintiff to pay the costs of the appeal.

NICHOLLS, C. J. I concur in the decree, but not in all of the expressions used or positions taken in the opinion.

PROVOSTY, J., concurs, but not in the dictum tending to class railway tracks with public highways free to the use of the public.

## On Rehearing.

## (Jan. 4, 1904.)

PER CURIAM. The argument and the reconsideration which this case has received upon the rehearing have led to some modification of the views heretofore entertained or acquiesced in by different members of the court, without, however, bringing about any practical change in the result—a majority, consisting of the organ of the court upon the former hearing, the CHIEF JUSTICE, and Mr. Justice BREAUX, being still of opinion that the judgment in favor of the plaintiff should be affirmed; Mr. Justice MONROE, for the reasons assigned in the original opinion; and the CHIEF JUSTICE and Mr. Justice BREAUX, for reasons which will be hereafter assigned by them.

It is therefore ordered, adjudged, and decreed that the decree heretofore entered be reinstated and made the final judgment and decree of the court.

LAND, J., takes no part.

See concurring opinions of NICHOLLS, C. J., 35 South. 907, and BREAUX, J., Id. 908, and dissenting opinion of PROVOSTY, J., Id.