DAWKINS, J.
This is an appeal by the defendant railway company from a verdict and judgment in the sum of $30,000 in favor of plaintiff, individually and as tutrix for her two minor children, for the death of the husband and father. She alleged that her husband, Thomas Blackburn, was killed by one of defendant’s trains on the morning of September 9, 1915, as the result of negligence on the part of its agents and employes; that the deceased was a young man, 32 years of age, with a good life expectancy; and, that he was earning $100 per month at the time of his death.
Defendant admitted the killing, but averred that it was due to the gross carelessness and negligence of the deceased, and that it, defendant, was in no wise legally responsible therefor.
The case was tried to a jury, which rendered a verdict in favor of plaintiff for the full amount claimed; that is, $30,000. Motion for a new trial was filed and overruled, and from a judgment on said verdict, defendant has appealed.
Statement of Case.
Deceased, Thomas Blackburn, left Alexandria, La., September 9, 1915, on the early morning passenger train of defendant, scheduled to arrive at Colfax, La., his destination, at 3:20 o’clock a. m. However, it was a little late on this occasion, and, according to the testimony of the conductor in charge, reached there about 3:30 a. m. Blackburn was drinking, and had to be invited out of the colored coach into the smoking car, upon his way up, according to the conductor. His condition was such that on reaching Colfax the conductor asked some of his friends to take charge of him until the train could get away. The passenger train proceeded toward Shreveport, La., its destination, and passed the southbound through freight, known as No. 39, on the siding at Aloha, some six miles further north. The freight train then came south, reaching Colfax some time between 4:30 and 5 o’clock a. m., the time of its arrival being a matter of dispute between the witnesses for plaintiff and defendant, which we shall discuss later on. It struck Blackburn something in excess of 100 feet south of the passenger depot in Colfax, and inflicted injuries from which he died in the *523 afternoon of the same day in the hospital at Alexandria, La.
Opinion.
[1] There can be no question but that deceased was guilty of the grossest negligence, in getting drunk and placing himself on the track of defendant company in the manner and at the place which he did. It therefore becomes necessary for us to determine, in the light of all the circumstances disclosed by the record, whether, notwithstanding this negligence, the defendant knew, or should have known, his danger, and accordingly did what was reasonably necessary to avoid injuring him, after it discovered, or by the exercise of such diligence as the circumstances demanded, should have discovered, his plight.
We take it that the record fairly shows, in fact, it is virtually admitted by both sides, that Blackburn was in such a state of intoxication as not to appreciate his surroundings and the dangers incident thereto, whether he was sitting or partially sitting, on the ends of the cross-ties, as contended by plaintiff, or lying down with his head between their ends, as claimed by defendant. In other words, his active negligence in placing himself upon defendant’s track was spent, and he was then in a state of what we will term passive negligence.
[2] Reverting again to the question of when train No. 39 reached Colfax, we think it established by a fair preponderance of all the evidence that it was about 4:30 a. m., and during the early morning twilight when the day begins to break — not light enough to be termed daylight, yet not dark enough to be called night. In reaching this conclusion, it is without imputing bad faith to any of the witnesses. The engineer, conductor, fireman, brakeman, and the physician who was promptly called to attend Blackburn after the injury, all testified that they had to use lights; while plaintiff’s witnesses, McDowell, Grigsby, Mrs. I-Iardberger, the night watchman at the latt Mill, Boykin, and Creighten, the newsboy, the latter being sworn on behalf of defendant, swore it was light enough for them to see without the assistance of artificial means. It is entirely possible that those on the train, riding with lights, would think it darker than it actually was, and, once starting out to use the lights, would continue to do so until it became entirely unnecessary, and that the doctor, arriving on the scene, would make use of the same lights; while McDowell and Grigsby, having arisen some time before, and being out in the twilight for a good bit, would be able to see better than those who were using lights. The same would apply to young Creighten. As to Mrs. Hardberger, we can only attribute her failure to see the lights upon her arrival at the place where the injured man lay either to a faulty recollection or to the fact that the doctor had completed his examination, and, it having become light enough to convince even the railroad operatives that artificial light was no longer necessary, they had been extinguished before she arrived. As to the testimony of the night watchman, Boykin, we think it very probable, from his own statements, that when he left the mill and started home the arrival and examination by the doctor had been completed, and the train had been pulled down to the siding to disconnect the caboose for the purpose of taking the injured man to Alexandria. This is borne out by the fact that he says the front end of the train was considerably below where the other witnesses place it at the time it first stopped; that he saw nothing to indicate that any one had been injured, did not know of it until noon, and by the further fact that he says the train commenced to back up shortly after he came out from the mill and upon the track.
The track was straight, with no obstructions for some two miles north of the passenger depot, and the same was true for a *525 distance of from one-fourth to one-half mile to the south. The track was practically level, except for a slight down grade south. There were no bushes or grass upon the roadbed ; it having been previously graveled. There were no other obstructions and, if there was any elevation of the track, it was very slight.
The train, No. 39, known as the “red ball” freight, pulled into Colfax at a rate of speed variously estimated at from 15 to 30 miles per hour. An average would make it about 221/2-, and we think this is about correct. Such is indicated by the fact that it was more than three hours late, the schedule called for 25 miles per hour, and the engineer testified that he always made the schedule time passing through such places, unless there were local laws or ordinances to the contrary. There being none in Colfax, we assume that he followed the usual practice.
While we know that it is a common occurrence, almost daily, and perhaps hourly, practice, for those along the sides of a railroad to wave to the engineer and fireman, and for them to return such salutations, still, we cannot bring ourselves to believe that the engineer, to say the least, had released his hold upon the throttle, left his seat in the cab, and was standing in the passageway between the tender and engine, waving to unknown persons outside, with his train running at the rate of speed which we have indicated, and through a place like Colfax. It does not seem reasonable within the human probabilities of the case, and it would require very strong proof to convince us of such conduct.
[3-5] The testimony is conflicting as to whether deceased was sitting on the ends of the cross-ties, or lying down with his head between their ends and his body projecting eastwardly and at right angles with the rails. Grigsby and McDowell say he was sitting on the ends of the ties, so that, according to the former, he saw Blackburn when crossing the railroad above the freight depot several hundred feet away and before getting over on the sidewalk, and that deceased continued in that position until their view was cut off by the bulk of the engine just before it struck deceased. The engineer and fireman say he was lying down, as above indicated, and that they did not see him until he started to rise up, about 60 feet ahead of the engine. Young Creighten, sworn on behalf of defendant, and who seems to be wholly impartial and without interest, testified (page 95 of the record) on that point as follows:
“Q. Please tell us in your own way, and speak loud so the gentlemen on the jury can hear you, what all you saw, just who was with him, what all he did, and just what happened.
“A. While I was there, they got off of the train, Mr. Blackburn and Mr. Sim Spikes, they got off together, and walked down the track. Mr. Spikes come back to the barber-shop, and Mr. Blackburn come back down the railroad. Then he lay down and fell backwards. That was soon as the passenger went up. Then when I was over to the Brinker, and went on to the drug store, and then I heard the train, and thought about Mr. Blackburn; but I had the papers and could not drop them and go back.”
And again, on page 98, the same witness says:
“Q. About how far below the depot was Mr. Blackburn sitting or lying as you have testified?
“A. At first he sat down, and then he fell backwards.”
This, together with the testimony of Dr., Blackwood, as to the nature and location of the injuries, the height of the parts of the engine which protruded over the rails, with the doctor’s opinion deduced therefrom, convinces us that deceased was reclining with the back of his shoulders against the rails, and in a state of stupefaction, was scuffling to arise when the train struck him. We quote from the testimony of Dr. Blackwood, page 178 of the record:
*527 “Q. Please describe the nature of tbe injury sustained by Mr. Blackburn, on this occasion.
“A. His shoulder was broken, his skull was fractured between the eye and ear; his nose was broken and lacerated, the bridge of the right lung, or breast, was crushed in; and several other lacerations, several minor injuries, but those mentioned were the greater ones.
“Q. From your knowledge and practice, as a doctor, what is your opinion, as to the position occupied by a person receiving such injuries discovered by you on the body of Mr. Blackburn, having been struck by a pilot of a passing train?
“A. From the injuries received it would indicate that he had his head toward the ties.
“Q. Which is more probable, that he was sitting on the end of the ties, standing up, or lying down, with his head next to the ties and raised up as the train approached?”
Here counsel for plaintiff objected, and tbe objection was sustained by the court. Then, on cross-examination by plaintiff’s counsel, this witness testified with respect to the same matters as follows (page 180):
“Q. Doctor, I wish you would state again the injuries you found on the body of Mr. Blackburn. ■
“A. There was a fracture of the skull, on the left side; a broken nose, broken sternum about the middle; broken left arm; laceration of the finger's on the left hand; a crush in of the ribs on the right chest above the right nipple; there was some minor bruises about over his face; the bones of his hand (left) were badly broken. He received a blow on the nose and left side of the face.”
Redirect examination on page 183:
“Q. I will ask you to please tell us and give your opinion as to how the blows were received, that you found upon his body.
“A. They were received from the train as it passed his body. He was struck by the train as it went by him.
“Q. What position was his body in?
“A. He was either sitting on the end of the ties, standing there, or lying down with his head in reach of some part of the moving train.
“Q. Were the injuries to his' side or chest caused by being struck by the train, or caused by his being thrown against the cross-ties as a result of the blow on his head?”
Objection was again made, and the question was apparently withdrawn. The examination continued:
“Q. Doctor, in your opinion as a medical expert, were the injuries to his ribs on the right side caused by his being struck there by the moving train, or was it caused by (the) his body being precipitated against a cross-tie, as a result of his head being hit by the train?”
Objection made and overruled by the court.
“A. I think that he was struck on the left side of the head, and thrown against some other object, or portion of the moving train, crushing his right side; there was no laceration on the right side to show that any sharp object had struck him.
“Q. What was his position at the time that he was struck, in your opinion as a medical expert, from the nature of the injury to the body?
“A. My opinion is, he was either sitting on the end of the ties, or lying on the end of the ties, with his back to the rails, with his head resting in his hands, more likely in a sitting position.”
There is nothing in the record to show the size or height of deceased, but, assuming him to have been an average, it hardly seems possible for him to have received such injuries, if he had been lying with .his head between the ties, and only started to rise just as the train struck him. The act of rising to a sitting position, it seems, would have brought practically all of his body without the range of contact with the protruding parts of the engine, with the possible exception of his head. As it was, in view of his injuries, he must have received a blow on the left side of the head, left shoulder and arm as the latter were broken, and we can only account for his right side being crushed in by the force of the blow from the pilot, driving him over and on the ends of the cross-ties, as suggested by the doctor.
We conclude, therefore, that deceased was not lying down on the ground with his head between the cross-ties, but was sitting or reclining on the cross-ties and leaning against the rail in such a position that, with a good headlight, or in the daytime, he could have been seen by the engineer and fireman, had *529 they been keeping a proper lookout, for several hundred feet.
In these circumstances, what was the law of the case?
Many cases have been cited by counsel on either side, but we think the issue here must be determined largely upon the peculiar facts and circumstances of this case. We have examined with much care the 16 decisions of this court cited by the appellant, but find that in each and all of them the injured or deceased persons were struck, either while walking on the tracks in a manner to lead those in charge of the train to believe they were going to get off, were in the yards and private premises of the railroad, or were in obscure places where they were not to be expected, or in places on the tracks where the enginemen were not required to use anything more than ordinary care. It would serve no good purpose to discuss the distinguishing features of each of these cases, since we have endeavored to recite the facts and circumstances here in such a way as to make the differences apparent to one wishing to examine them.
[6, 7] In our opinion this case must turn upon the failure of the engineer or fireman to see deceased in time to stop and avoid striking him. As indicated heretofore, the active phases of his gross negligence were spent, and he was in such a position of apparent helplessness as to have been seen and his condition appreciated had the proper precautions been observed. It will not do for railroad companies to run their trains into and through thickly populated towns and cities, by depots and places where people are known to frequent, at such high rates of speed, their employés not seeing that which, by the exercise of ordinary care, they should see, and then be permitted to escape liability because of the inability of such employés to stop the trains when the danger is actually discovered. Under such circumstances, ordinary prudence should induce them to get their trains under such control as, with a careful watchout, they will be able to stop when necessary. In other words, increasing caution with danger, such speed only should be maintained as will enable them, with the light available, whether natural or artificial, to see persons or objects upon their tracks, and by the use of modern appliances to stop and avoid striking them, if the necessity should appear to a reasonable mind. If this were not required, they might as well pull the throttle open and go through at full speed, in so far as any good might result from an effort to stop when running at such a speed as would not permit it to be done after seeing the danger. This train was either running at such a rate of speed that it could not be stopped within the distance objects on the track could be seen, or the lights were defective, or the trainmen were not keeping a proper lookout. Whichever may have been the case, that was the proximate cause of the injury. If there were difficulties against seeing, this was all the more reason why greater care should have been used. At the place where Blackburn was killed, the railroad track was used as much as the street, to the knowledge of defendant and those in charge of the train. It was a case of the last clear chance, and the chance was, or should have been, with the defendant.
We may add that both the deceased and the employés of defendant were guilty of the grossest negligence, the one in getting drunk and lying down upon a railroad track, and the other in running through a populous town and frequented depot grounds, and a place where people might be expected to be, without exercising proper care. But Blackburn was no longer capable of exercising powers of discretion, and proper precautions by defendant would have discovered that condition, whereas the active negligence of defendant continued down to the time of striking deceased.
There is no difference, in principle, be *531 tween this and the case of McGuire v. V. S. & P. Ry. Co., 46 La. Ann. 1543, 16 South. 457. The court there held the defendant liable because of the negligent failure to repair a defect in the engine, which permitted steam to escape and obstruct the engineer’s view ahead, and which defect existed from the beginning of a journey from Shreveport to Monroe, La., nearly 100 miles, with no power in the inanimate engine to change its condition, and which condition continued down to the moment of the accident;- yet this defect was held to have been the proximate cause of the injury, so as to defeat the defense of contributory negligence under the circumstances of that case. In the case at bar, the enginemen possessed, or are presumed to have possessed, at all times, the powers of discretion to enable them to act upon the reasonable requirements of the case. Can the negligent placing of a defective engine in the hands of an engineer, and having him use it in the manner as was done in the McGuire Case, bring home to a railroad company responsibility for its consequences any more directly than the negligent action of a rational employe in handling such an agency? We think not. See Davenport v. Dubach Lumber Co., 112 La. 943, 36 South. 812. In the McGuire Case, deceased was seen only a few moments before the accident walking down the track, with at least some control over his faculties, while in the present case it is undisputed that Blackburn was “past going,” and the same would have been apparent to any one seeing him in his helpless condition on the track. McGuire v. V. S. & P. Ry. Co. has been cited with approval by this court in the following cases: Rice v. Crescent City Ry. Co., 51 La. Ann. 115, 24 South. 791; Kramer v. City Lake R. R. Co., 51 La. Ann. 1694, 26 South. 411; Farrar v. Carrolton R. R. Co., 52 La. Ann. 422, 26 South. 995; McNulty v. Railway Co., 52 La. Ann. 1039, 27 South. 569 (differentiated); Lampkin v. McCormick Co., 105 La. 418, 29 South. 952, 83 Am. St. Rep. 245; McClanahan v. V. S. & P. Ry. Co., 111 La. 792, 35 South. 902; Davenport v. Dubach Lumber Co., 112 La. 943, 36 South. 812; Harvey v. La. West. Ry. Co., 114 La. 1079, 38 South. 859.
[8] For the reasons above set forth, we conclude that defendant was liable in damages for the death of Blackburn. However, we believe the amount of the judgment is excessive, in view of the sums allowed in other cases where the circumstances and conditions were similar. We think that to allow $5,000 apiece to the wife and each of the two children would meet the ends of substantial justice between the parties.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be and the same is hereby amended by reducing the amount of the judgment so as to allow the plaintiff Mrs. Florence Blackburn the sum of $5,000 in her own right, and the further sum of $5,000 for each of her minor children, Corena and Verabella Blackburn, and making a total of $15,000, with interest thereon from the 10th day of May, 1917, until paid. It is further ordered that the plaintiff and appellee pay the costs of this appeal, and that the defendant, appellant, pay the costs of the court below.