GIBSON v. T. & P. RY. CO.

---

(April 1, 1929.  Opinion and Decree.)
(April 29, 1929.  Rehearing Refused.)

Chas. T. Wortham, of Donaldsonville, Roland B. Howell, of Thibodaux and H. B. Leach, of New Orleans, attorneys for plaintiff, appellee.

Gilbert and Gianelloni, of Napoleonville, and Spencer, Gidiere, Phelps and Dunbar, of New Orleans, attorneys for defendant, appellant.

JONES, J. Plaintiff sues to recover $12,-000.00 for the death of George McCalip, her twenty-year-old son by a former marriage, who was instantaneously killed on April 14, 1927, while sitting or lying on the cross-ties of defendant's track, either asleep or ill, at 6:35 a. m., by a train of defendant, Southeast of Donaldsonville.

In its answer defendant denies the allegations of each and every paragraph, but does not plead contributory negligence. The case was tried by a jury, which returned a verdict for $6000.00.

Motion for a new trial was refused by the District Judge, who gave his reasons as follows:

"The issue presented to the jury was a rather close question of fact, which, from the evidence, they resolved in favor of the plaintiff and awarded a verdict for $6,-000.00. They were instructed by the court as to what is conceived to be the law governing the duties of an engineer on a railroad train to keep a lookout at all times for objects which may be or come upon the railroad tracks, and evidently came to the conclusion that under the facts in the case the engineer was negligent in not seeing the unfortunate victim in this accident, in time to avoid killing him. The law as I take it is, that the jury's verdict is entitled to great weight unless it be manifestly erroneous, and I am not prepared to say that it is in this case. If I am wrong in my view of the matter now I think there is a good record made on which the error, if any, can be corrected by the appellate court.

"I am of the opinion, however, that the amount awarded is more than is warranted under the evidence, but that, also, is a matter which if wrong, can be corrected on appeal without the necessity of trying this case all over again."

We do not pass upon the ruling of the trial judge on the objections to the testimony of defendant's witnesses on the

ground that contributory negligence had not been pleaded, because the sole question before us is whether, under all the circumstances of the case, the engineer and fireman had the last clear chance to avoid the accident.

This principle is stated in the case of McGuire v. V. S. & P. Ry. Co., 46 La. Ann. 1543, 60 So. 457, in the first paragraph of the syllabus prepared by the court, as follows:

"In an action for damages against a railroad company by the surviving parents for the loss of their son run over and killed by the locomotive, the defense of contributory negligence will not avail, if by reasonable care on the part of those in charge of the train the accident could have been avoided. * * *."

There is very little dispute about the facts, which may be briefly summarized, as follows:

The accident occurred in the open country about 6:35 p. m., April 14, 1927, where the Winchester Plantation Road crosses the track of defendant. This road was used by the laborers on the plantation and was traveled by the wagons and mules in going back and forth to the rice plantation. On the morning of the accident there was no fog. The day was clear, and the track was straight for several miles. The train which struck the decedent was coming South toward New Orleans, at a speed of 50 or 52 miles per hour. It consisted of an engine, a tender and eight coaches, the length of each coach being between 60 and 70 feet and the length of the entire train, about 600 feet. The deceased was a little more than six feet in height and weighed from 155 to 160 pounds. The roadbed was about four feet higher than the level of the ground. There were no eye witnesses to the accident, except the engineer and the fireman.

The engineer testifies that he first saw the decedent about 300 or 350 feet away, on the left hand side of the track; that the object appeared to be at the end of the cross-ties, or out on the embankment near the ends of the ties; it was in a stooping position and he could only see the shape of the back; it looked like a dog or a calf, or something of the kind in the weeds at the side of the track; he did not realize it was a man until he was within 150 or 250 feet of the object, when he began to blow his whistle and put on his brakes, but it was too late; he thought that the man must have raised up, although he did not see him; he stopped his train as quickly as he could and backed up two or three car lengths to where the man was lying and found that he was dead; the Johnson grass by the tracks was perhaps three feet high and it was growing up near the end of the cross-ties and the man was about eight or ten feet east of the plantation road. The body was knocked about four or five feet.

The fireman testified that he first saw the object about 500 feet away on his side of the track; that he "never saw his face at all, only his shoulder and head;" it looked like a dog or a buzzard and he did not recognize it as a man until he was within about 200 or 250 feet, when he called to the engineer, who was already blowing his whistle; the man was sitting in a stooped position but he could see his shoulders and head; his seat is about twelve or fourteen feet above the track.

The record contains two photographs which were taken on April 23rd, nine days after the accident happened. These photographs show that the Johnson grass did not cover the ends of the ties and that it was not sufficiently high to cover the body of the man sitting on the end of a tie.

A test was made by the two Gibsons, the step-father and his brother, at the scene of the accident on the day the photographs were taken and both of these witnesses testified that a man sitting on the rail could easily be seen from a point 1800 feet up the track. Another test was. made by disinterested witnesses on the day before the trial, which was held on February 13, 1928. Although the day was cloudy, the witnesses testified that they could see a man sitting on the end of the cross-ties from a distance of 1600 feet. The engineer testified that he might possibly stop such a train, going at 50 miles per hour, in about 600 feet, but usually it would take a much greater distance.

As the engineer says that he could only see "the shape of the back," and it looked like "a dog or a calf," and as the fireman, who had a better view, says "I never did see his face at all, nothing but his shoulders and his head," we conclude that the man was sitting with his back toward the train.

The evidence seems to us to justify the finding of the jury, for we are convinced that the engineer and fireman, under all the circumstances of the case, if they had been acting with the ordinary diligence required of such employees, should have seen the deceased in time to stop the train and should have done so, as the man, who had his back toward them, gave no sign of being awake or capable of moving.

A similar point has been before the court in several cases. In Blackburn vs. Railway Co., 144 La. 520, 80 So. 708, where an intoxicated man, sitting on cross-ties, or leaning against the rail, was killed near the station in Colfax, La., about 4:30 a. m., on September 9, 1915, the court uses the following language:

"We conclude, therefore, that deceased was not lying down on the ground with his head between the cross-ties, but was sitting or reclining on the cross-ties and leaning against the rail in such a position that, with a good headlight, or in the daytime, he could have been seen by the engineer and fireman, had they been *keeping a proper look-out for several hundred feet.* * * *

"We have examined with much care the 16 decisions of this court cited by the appellant, but find that in each and all of them the injured or deceased persons were struck, either while walking on the tracks in a manner to lead those in charge of the train to believe they were going to get off, were in the yards and private premises of the railroad, or were in obscure places * * * on the tracks where the enginemen were not required to use anything more than ordinary care. * * *

"In our opinion this case must turn upon the failure of the engineer or fireman to see deceased in time to stop and avoid striking him. As indicated heretofore, the active phases of his gross negligence were spent, and he was in such a position of apparent helplessness as to have been seen and his condition appreciated had the proper precautions been observed."

On this point see, also, the following cases:

McClanahan vs. V. S. & P. Ry. 111 La. 781, 35 So. 902;

Jones vs. C. R. I. & P. Ry., 162 La. 690, 111 So. 62;

Vaughn vs. N. O. Ry. & Light Co., 13 Orleans App. 116;

Grennon vs. N. O. Public Service, Inc., 10 La. App. 641, 120 So. 801.

The facts in this case are closely similar to those in the Blackburn case quoted above, but they differ from those in Hebert vs. La. Western R. R., 104 La. 483,

29 So. 239, for there the decedent, who was sitting on the end of the tie with his side toward the approaching train, when the whistle blew, turned his head toward the train, and the court held that the engineer, who saw the man plainly some distance away, was justified in thinking that the man would step off the end of the tie, or step aside. Here, the man, who had his back to the train, and was sitting in a stooping position, never gave any evidence that he heard the signals.

Defendant relies upon three cases: Brooks vs. T. & P. Ry., 141 La. 809, 75 So. 731; Rogers vs. L. R. & N. Co., 143 La. 158, 78 So. 237, and Tyer vs. Gulf C. S. F. R. R. Co., 143 La. 178, 78 So. 438. A brief analysis of these decisions will show that they are not applicable here, as the accidents happened at night, in deserted localities, and not on a clear day near a plantation road.

In the first case cited the accident happened at 1:00 o'clock in the morning at a lonely, deserted point, 3750 feet east of the railroad station and the man was lying in a drunken slumber upon the track. The track was not straight, but curved and the court found that the evidence did not show that the engineer, in the exercise of ordinary diligence, should have seen the decedent.

In the second case the accident happened between 10:30 and 11:00 o'clock at night on the outskirts of the City of Alexandria. On one side of the track was an open field and on the other side a thicket, "a place where no one would reasonably expect to find a man between 10:30 and 11:00 o'clock at night." The deceased was lying between the rails of the track and could not be seen by the engineer in time to stop the train. In that case, however, there was evidence that tended to show that the engineer should have seen the man in from 350 to 500 feet, under the circumstances.

In the third case cited, the accident happened about ten minutes of eight o'clock on the evening of June 14th, when the atmosphere was smoky and some darkness had spread over the wooded swamps through which the train was running. The engineer swore that he could not have seen the man any sooner than he did see him under the existing circumstances.

As to the quantum, we think, with the trial judge, that the amount allowed should be reduced. The evidence shows that the mother, aged 42, had five children, three girls and two boys. The eldest girl was working in a store at $8.00 a week. The boy's stepfather, plaintiff's second husband, is a general contractor or head carpenter and had always made a living for himself and family until a few months before the death of his step-son, when he suffered a broken hip, which he claims had incapacitated him for a while, and would necessarily diminish his income in the future. The deceased, who was the eldest child, and a painter by trade, was, at the time of his death, walking out to Houston, Texas, to obtain work, which he had not been able to secure in Jackson, except at irregular times. His mother had not seen him since the last of February, when he left Jackson, Miss., to visit his grandparents in Meridian, Miss. Both she and her husband testified that he had been out of work about two months before he left Jackson; that he earned, when at work, about $7.00 a day; that he had always lodged and boarded at home and gave his mother one-half of his earnings. Of course there is no evidence as to how much he would have contributed in the future, when living away from his home. Furthermore

the young man was likely to get married at any time.

In Taylor vs. V. S. & P. Ry., 151 La. 270, 91 So. 732, the parents were allowed $5,000.00 for the death of an unmarried son, 26 years old, where he was killed instantly. They were not dependent upon him for support, but he occasionally contributed financial assistance.

In Rousseau vs. T. & P. Ry., 4 La. App. 691, decided in August, 1926, this court allowed $6,000.00 to both parents for the death of an unmarried son, 26 years old, who sued for damages for their son's suffering, for their loss of support, affection and mental anguish.

Here there was no claim for inherited damages, as the boy died instantaneously.

See, also, Johnson vs. Industrial Lumber Co., 131 La. 897, 909, 60 So. 608; Hebert & Wife vs. Baton Rouge Elec. Co., 150 La. 958, 91 So. 406, 25 A. L. R. 245; Aymond vs. Western Union Tel. Co., 151 La. 184, 188, 91 So. 671.

It is always difficult to fix the amount of damages in such cases, but a careful study of those nearest in point convinces us that a judgment for $5,000.00, under the circumstances, will be consistent with the decisions of our Appellate Courts.

For the reasons above stated the judgment appealed from is amended, and it is now ordered that there be judgment in favor of plaintiff, Mrs. J. A. Gibson, and against defendant, Texas & Pacific Railway Company, in the sum of Five Thousand Dollars ($5,000.00), with interest at five per cent per annum from judicial demand until paid, and as thus amended, affirmed. Costs of lower court to be paid by plaintiff and of this court to be paid by defendant.

JANVIER, J., dissenting.

I am unable to agree with my colleagues in their view that the operatives of the train of defendant were negligent in not sooner realizing that the object which they saw was a man and in not stopping the train sooner than they did.

I quite agree that there are certain circumstances under which engineers must be continuously and constantly on the alert and under which trains must be under such control as to permit of their being stopped on very short notice. Those circumstances were present in the case of Blackburn vs. L. R. & N. Co., 144 La. 520, 80 So. 708, on which case my colleagues base their present opinion but seem to me to be conspicuous by their absence in the case now before us. The circumstances to which I refer are present when, on account of proximity to cities or towns, or much traveled roads, the trainmen know or ought to know that there are likely to be persons on or near the tracks. That such was true in the Blackburn case is conclusively shown by the following excerpt from that decision: "At the place where Blackburn was killed, the railroad track was used as much as the street, to the knowledge of defendant and those in charge of the train."

That the circumstances surrounding the happening of the accident in the case now before us were entirely different is well illustrated by the fact that the place at which the deceased was killed was so inaccessible that the parish authorities came to the conclusion that they could not move the body even to the front road without great difficulty and expense and therefore buried it where it was found, alongside the railroad track.

The facts of this case and the circumstances surrounding the accident appear

to me to bring it squarely within the doctrine announced by the Supreme Court in Hebert vs. Louisiana Western Railroad, 104 La. 484, 29 So. 239, in the syllabus of which the court said:

"The engineer of a train running on schedule time, on its own right of way, in the open prairie away from any town or crossing, is not called upon to immediately slacken its speed, from the simple fact that a trespasser, sitting upon the ties, does not at once rise and change his position on receiving warning of the approach of the train by the ringing of the bell, and the blowing of the whistle, duly and properly given."

If the deceased in the instant case was sitting on the top of the rail, as is contended by plaintiff, there was nothing in his position to indicate that he was in a helpless condition and, even if the engineer had seen him sooner than he did, under the doctrine announced in the Hebert case, he would not have been required to do more than sound his whistle and ring his bell, because he would have been justified in assuming that a person sitting upright on top of a rail is not helpless and will heed the warnings given. If, then, under those circumstances, the engineer was not called on to immediately slacken his speed, but only to sound his signals, did he not do all that the law requires of him when, at about five hundred feet from deceased, which was the point at which deceased was first seen, he blew his whistle and applied his brakes?

If deceased was not sitting on top of the rail, then the tests made by plaintiff's witnesses, which show that a man sitting on top of the rail could be seen fifteen or eighteen hundred feet away, are absolutely valueless. If deceased was sitting on the ground or lying near the ends of the crossties, then it is easy to understand why the operatives of the train did not realize sooner that the object they saw was a man.

It is most significant that both the engineer and the fireman saw the object at about the same instant. This shows, as I view it, two things: That they were both looking out ahead and that what they saw was not recognizable as a human being further away than about five hundred feet, which is about the distance it was away when they realized what it was.

The train in question was a heavy, fast moving passenger train, and while there is no testimony to show within what distance it could be stopped, it is well known that such a train cannot be stopped within at least twice the distance which was left to the engineer after he saw the object and realized what it was.

That there is a vast difference between the degree of care required of trainmen in cities or towns or in the thickly populated neighborhoods and that necessary in obscure places was recognized by the Supreme Court in the Blackburn case, where, in discussing the various decisions in similar cases that Court said:

"We have examined with much care the sixteen decisions of this court cited by the appellant, but find that in each and all of them the injured or the deceased persons were struck, either while walking on the tracks in a manner to lead those in charge of the train to believe they were going to get off, were in the yards and private premises of the railroads, or were in places on the tracks where the enginemen were not required to use anything more than ordinary care."

I know quite well that these cases differ, each from the others and that each must be decided according to its own facts but it seems to me that the general principle which runs through them all is that the speed of the train and the attention of the

engineer should be proportionate to the probability of danger. It is very evident that the probability of danger to pedestrians in the locality in which the deceased was, was very remote and consequently, only ordinary care should be exacted of the engineer.

The opinion of my colleagues, as I read it, hold the engineer to the highest degree of care, in fact to such care as should have been properly required of him had he been operating his train through a city or past a depot, or across a much traveled highway.

The cases involving the running over of persons on tracks, helpless by reason of intoxication or sickness, or otherwise, fall into either of two well defined classes. Those in which the crew of the train should be held to the very highest degree of care and those in which only ordinary care should be required. The Blackburn case, supra, is a typical example of the former and the Hebert case, supra, is an excellent example of the latter. In all of the cases, where it appeared that the injured person was helpless, it was held that, no matter how great his negligence in going upon the track in the first instance, as soon as helplessness overcame him, the active phases of that negligence were spent and his negligence in remaining passive became passive and that after that moment the sole question to be determined was whether or not the crew of the train had used such care as was required under the circumstances. In all the cases cited in either of the cases mentioned or in any other I find none where the spot at which the accident occurred was so isolated as in the instant case and where, therefore, there was less reason for the crew of the train to have reason to expect a person to be asleep on the track.

For these reasons I respectfully dissent.