The plaintiff in this suit is the widow of Paul Griffin, negro. She sues for herself and as the natural tutrix of five minor children born of the marriage with her deceased husband, for damages arising out of his death following an accident when he was run over by a freight train of the defendant railroad company in the town of Opelousas at about 11 at night on Saturday, August 24, 1940.
In her petition she alleges that her husband and a companion (who it developed from the testimony was a white man) were both sitting on the end of a cross-tie against the east rail of the interchange track between the tracks of the defendant and those of the Southern Pacific Railroad Company in the town of Opelousas; that they were both drunk, were both unaware of the approaching train and were both struck by it, her husband having been fatally injured as he died early the following morning in the hospital to which he had been taken.
She alleges that from the point where her husband was sitting on the track, to the building of the Opelousas Oil Mill, some 780 feet to the south, the interchange track is straight and unobstructed and therefore the train operators could easily see him sitting there, especially so since the place was illuminated by the headlight of the engine and also the lights from the street lamps and those from a saloon at the intersection of Church Street and Railroad Avenue, almost adjacent to the premises. She avers that if the train operators did not see her husband then they should have seen him in ample time to lower the speed of the train and avoid striking him, but that they made no effort to do so until it was too late. She avers further that the train was going at an excessive rate of speed under the circumstances prevailing at the time, that no sufficient warnings were given by those in charge of it, that they failed to keep a proper lookout and to reduce its speed when it became apparent to them that her husband was not going to move from his sitting position.
As it seems to be conceded, as indeed it must be, that her deceased husband was grossly negligent in being where he was at the time without taking any steps to avoid being run over, her case seems to be built on the theory that the defendant's train operators had the last clear chance in which to avoid the accident and did not avail themselves of it.
The demand is for the sum of $37,600 of which $6,000 is asked for herself and a like amount for each of her five minor children, $1500 for herself and her said children for the pain and suffering endured by her husband before he died and $100 for funeral expenses.
The defense is practically a general denial of all of the allegations of plaintiff's petition and in the alternative it contains a plea of contributory negligence which is urged against the plaintiff's deceased husband in the following particulars: (1) That he chose to sit upon the railroad track where he knew he had no right to be and therefore he was a trespasser; (2) that he sat at that place knowing it to be a place of danger where he should have expected the passing of trains, and remained there without making any effort to keep himself advised of the approach of any such trains from either direction; (3) that he sat there without exercising his sense of vision which, if he had, would have been bound to disclose the approach of the train and he would have instantly removed himself from the danger and (4) that he failed to exercise his sense of hearing, which if he had, would have been bound to disclose the presence of the train, because it was giving the whistle and bell warnings and besides, the noise made by its engine would have been heard by him and he would have instantly removed himself from the place of danger.
On the issues as presented, the trial judge rendered judgment in favor of the defendant and dismissed the plaintiff's suit whereupon this appeal was taken.
The only testimony in the case is that offered by the plaintiff through her witnesses and the documentary proof submitted by her. The defendant's train operators however, the engineer, the fireman and the brakeman, who were all three in the locomotive at the time of the accident, *Page 116 
were placed on the stand by the plaintiff under cross-examination and their testimony was elicited in this manner.
All three of them testified that they were moving the engine with five loaded freight cars on the interchange track from the defendant company's tracks to those of the Southern Pacific. They state that they were in no hurry as that train does not run according to schedule. The fireman was on the left side of the cab and the engineer and the brakeman were on the right. The headlight of the engine was shining brightly and the train running smoothly, going at a speed of from eight to ten miles per hour, at which it could be stopped within 150 feet. They all state that the whistle was blowing in the vicinity of the oil mill for a crossing at that point and that the bell was being rung constantly from the time the train passed the oil mill on the south, until the accident happened.
At this point it may be important to state that where the accident took place, there is what appears to be a rather sharp curve in the track, which however, is not so well defined in the testimony of the various witnesses. A better idea can be obtained of the arc of this curve from the photographs that have been introduced in evidence than from any other testimony. There is in the record, a very large map of the City of Opelousas which was offered by the plaintiff, but we find it difficult to follow the railroad tracks as they are marked thereon. According to the photographs, from which we obtain the best idea, it would seem that it is a rather sharp curve. These also show that the deceased and his companion were sitting at a point outside of this curve, in the direction opposite from that in which the engine was coming out of it.
To go on with the testimony of the train operators, they state that as the locomotive rounded the curve and the headlights flashed upon the two men, the engineer immediately applied his brakes, blew numerous short blasts of the whistle, and the brakeman shouted a warning. The fireman who was on the left side of the cab did not see the two men. From their testimony we conclude that the curve ended about 75 feet from where these two men were sitting and that it was impossible for those on the locomotive to see them before they had rounded it.
Stress is laid by the plaintiff's counsel on the fact that in this vicinity of the town of Opelousas, there are quite a number of houses, inhabited mainly by negroes; that in fact it is very thickly populated and that especially on Saturday nights it is generally known (and was known by the train operators) that a large number of negroes congregated at the saloon on the corner of Church and Railroad Streets; and also there was a passage way leading to the railroad tracks and across, that was constantly used by pedestrians. All of these facts are more or less admitted by the men who operated the train, and the only dispute there might be concerning any of them would be that the locality was built up considerably in the last two years and that at the time of this accident there were not quite as many homes as there are now.
A witness by the name of Wallace Batiste, negro, who lives in a shack or shanty right opposite the point where these two men sat on the track, testified that he passed that spot at about 6 o'clock in the evening and that they were already there. He says that they were drinking then; that he sat on his porch until about 10 o'clock and they were still there. He says that he was awakened at 11 o'clock by the distress signal given by the engineer as he rounded the curve. He states that after the accident he could see from his porch, by looking underneath the train, the position in which the two injured men were lying. This seems a bit far-fetched and because of another fact which he testified to, with regard to there being a box car ahead of the locomotive, which none of the other witnesses saw, his testimony may be said to be of a rather doubtful character.
A witness by the name of Ashton Chenier, the bartender in the saloon referred to, testified about the two men having been drinking in his place and that he sold them a bottle of wine before they left. He says he heard the blasts of the whistle of the train and ran to the door of the saloon immediately and according to his judgment it was going about 15 or 20 miles an hour.
The attempt of plaintiff to prove that the place where these two men were sitting was highly illuminated by the street lights and the lights of the saloon, if that was material, was weakened by the testimony of one of her own witnesses who says that those lights could not shine on that particular spot. Besides, Officer Simon Stelly referred to that illumination as having been the equivalent of moon-light, and Chenier says that you could see but that it was "a dull light." *Page 117 
These are about all the salient facts which we find it necessary to refer to and from which we are led to conclude that even though admitting that there was any negligence at all on the part of the men who were operating the train, they did not have the last clear chance to avoid the accident.
It would be difficult indeed to hold that these men were operating the train in a careless and negligent manner. Certainly the testimony indicates that the whistle was blown at the time the train left the oil mill, some 700 or more feet away, and that the bell was constantly ringing. The strong preponderance of the testimony is that the train was not going faster than 10 miles an hour, as the only one who says anything otherwise about its speed is the witness Chenier, and he merely ventured the opinion that it was going about 15 or 20 miles. It was stopped within 60 or 65 feet after it struck the men, which shows that it was not going fast. It is evident from the testimony, such as it appears that the moment the engineer actually saw the two men on the track he applied his brakes, blew the distress whistle and did everything that he could to stop the train which was in good mechanical condition. However as he was then only 75 feet away from them, and as it required 150 feet to make the stop, the accident was inevitable. The sole question that is left therefore, is should the engineer or other operators of the train have seen the men before, and taken more precaution than they did in order to avoid running into them.
The liability of the operators of a railroad engine or of an automobile who is charged with negligence resulting in an accident for failing to see in time what he should have seen, must be tested and judged by the situation and the conditions surrounding his ability to have seen the object ahead of him in time before running into it. If the train is on a straight stretch of track or the automobile is on a straight road for a considerable distance, as he is expected under the law, to keep a sharp lookout ahead, naturally he is held to have seen the object and should have taken the necessary precautions to avoid running into it. The difference between this case and those relied upon by the plaintiff, especially Miller v. Baldwin et al., La.App., 178 So. 717, Blackburn v. Louisiana Railway 
Navigation Company, 144 La. 520, 80 So. 708, and Jackson v. Cook,189 La. 860, 181 So. 195, lies in the fact that this train was in a curve and that the men who were run into were sitting at a distance of some 75 feet outside of the curve. Naturally as the engine was rounding the curve, its headlight was following the contour of the curve itself and it would seem to be a physical impossibility for the beams to have projected around and beyond the curve and shine on the two men. This is a physical fact which gives weight to the testimony of the engineer and brakeman, who stated that it was only after they had rounded the curve that the headlight for the first time disclosed the presence of the two men who were then about 75 feet away, and certainly according to their further testimony, everything was then done to try to stop the train but that could not be done in time.
Beyond this, were these train operators expected to use any more precaution than they did because of the fact that people frequently use the railroad track in that thickly populated vicinity as a foot path, especially on a Saturday night when it might be expected that some of them would be drinking and not able to take care of themselves when walking on the track? That no doubt would furnish a reason why men in charge of the train, knowing these conditions to exist, would have to be more careful than at a place where they do not exist or are not known by them to exist. But what more could be expected of the defendant and of the men in charge of its train than was done in this case? The engine was in good mechanical condition and was equipped with a good headlight that was beaming brightly on the night of and at the time this accident took place. The brakes were working as they should, and, running at a speed of 8 to 10 miles an hour, as it was, the train could be stopped within 150 feet. Because it was rounding a curve, it was physically impossible for any of its operators to see the two unfortunate victims of the accident before they were emerging from the curve, and as the two men were sitting on the track at a distance of only 75 feet from that point, that is how far they were from them when the trainmen first saw them. Under the circumstances even had the train been going at a slower rate of speed than it was the operators would not have seen them any sooner than they did and nothing more than was actually done by them in sounding the distress signal and immediately applying *Page 118 
the brakes would have avoided the accident.
The demands of the plaintiff were properly rejected by the judgment of the lower court and for the reasons stated herein, it will be affirmed.
Under an order of the district judge, plaintiff was permitted to prosecute this suit in forma pauperis and was therefore relieved from the payment of court costs.
Judgment affirmed.